AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means (USAO Rev. 12/20)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| 21045 Vanowen Street, Apartment 211, Canoga Park, California 91303 | ) ) ) | Case No. 21-MJ-02063 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1962(d) | RICO Conspiracy |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Firearms or Ammunition |
| 21 U.S.C. § 841(a)(1) | Possession w/ Intent to Distribute Controlled Substances |
| 21 U.S.C. § 846 | Conspiracy to Possess w/ Intent to Distribute Controlled Substances |
| 18 U.S.C. § 1028 | Fraud in Connection w/ Identification Documents and Authentication Features |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

_____
*Applicant's signature*

_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>          Honorable Michael R. Wilner
_____
*Printed name and title*

AUSA: El-Amamy x0552

**ATTACHMENT A-1**

PREMISES TO BE SEARCHED

The premise is located at 21045 Vanowen Street, Apartment 211, Canoga Park, California 91303.  The SUBJECT PREMISES is a unit on the second floor of the apartment building.  Each unit inside of the complex is assigned a unique number, and the SUBJECT PREMISES is apartment number 211.  The front door faces east, and is white in color with the numbers 211 affixed to the front door.  The exterior of the apartment complex is shown in the photographs below:



**ATTACHMENT B**

**X.**   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1962(d) (Racketeer Influenced and Corrupt Organization ("RICO") Conspiracy); 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm or Ammunition); 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances); 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances); and 18 U.S.C. § 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, balloons, and packaging materials;

c.   Firearms and ammunition;

d.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or

i

transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

   e. Data, records, documents, or information (including electronic mail and messages) pertaining to obtaining, possessing, using, or transferring personal and/or financial transaction identification information for persons other than Patrick Van REENEN ("REENEN"), such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

   f. Any altered, counterfeit, or fraudulent identifications, checks, access devices, monetary instruments, or other official documents;

   g. Any identifications, checks, access devices, monetary instruments, or other official documents that are not addressed to, or in the name of, REENEN;

   h. Any tools or equipment, such as computers, software, printers, scanners, embossing machines, credit card readers or encoders, washing chemicals, or imprinting tools, used or intended to be used to alter, counterfeit, or create fraudulent checks, access devices, or other monetary instruments;

   i. Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of

controlled substances or firearms, or drug or firearms
customers, including calendars, address books, telephone or
other contact lists, pay/owe records, distribution or customer
lists, correspondence, receipts, records, and documents noting
price, quantities, and/or times when drugs, guns, or ammunition,
were bought, sold, or otherwise distributed, whether contained
in hard copy correspondence, notes, emails, text messages,
photographs, videos (including items stored on digital devices),
or otherwise;

   j. Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

   k. Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

   l. Audio recordings, pictures, video recordings, or
still captured images related to the purchase, sale,
transportation, or distribution of drugs, firearms, or
ammunition;

  m. Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

  n. Any and all cryptocurrency, to include the following:

   i. any and all representations of cryptocurrency public keys or addresses, whether in electronic or physical format;

   ii. any and all representations of cryptocurrency private keys, whether in electronic or physical format;

   iii. any and all representations of cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet.

The United States is authorized to seize any and all cryptocurrency by transferring the full account balance in each wallet to a public cryptocurrency address controlled by the United States.

**WHERE APPROPRIATE:** The United States is further authorized to copy any wallet files and restore them onto computers controlled by the United States.  By restoring the wallets on its own computers, the United States will continue to collect cryptocurrency transferred into the defendant's wallets as a

result of transactions that were not yet completed at the time
that the defendant's devices were seized.

       o.   Any digital device which is itself or which
contains evidence, contraband, fruits, or instrumentalities of
the Subject Offenses, and forensic copies thereof.

       p.   With respect to any digital device containing
evidence falling within the scope of the foregoing categories of
items to be seized:

          i.   evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,
browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

          ii.   evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

          iii. evidence of the attachment of other devices;

          iv.   evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

          v.   evidence of the times the device was used;

          vi.   passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and

connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and

attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

    c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

    d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

    e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

    f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress REENEN's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of REENEN's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain

access to the contents of any such device.  In depressing a
person's thumb or finger onto a device and in holding a device
in front of a person's face, law enforcement may not use
excessive force, as defined in Graham v. Connor, 490 U.S. 386
(1989); specifically, law enforcement may use no more than
objectively reasonable force in light of the facts and
circumstances confronting them.

    8.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order

**<u>AFFIDAVIT</u>**

I, Merrilee Goodwin, being duly sworn, declare and state as
follows:

## I.   <u>INTRODUCTION</u>

1.   I am a Special Agent with the Federal Bureau of
Investigation ("FBI").  I have been a Special Agent with the FBI
since 1998.  I am currently assigned to a Domestic Terrorism
Squad of the Los Angeles Field Office, where I primarily
investigate people who commit violent criminal acts in
furtherance of their political or social ideology, and
investigate threats associated with the nefarious use of
chemical, biological, radiological, nuclear, and explosive
materials.  In this capacity, I investigate federal crimes as it
pertains to terrorism, and have gained experience in cyber-based
matters including those involving dark web markets.  As a
result, I am familiar with the methods used by criminals in
furtherance of their criminal activities in both the virtual and
physical worlds, and I have received both formal and informal
training from the FBI and other institutions regarding cyber and
computer crime investigations and review of digital devices.  As
a Special Agent, I completed the FBI Academy in Quantico,
Virginia, and received training to include the fundamentals of
law, ethics, interviewing, report writing, firearms,
surveillance, defensive tactics, and case management.  I have
also received training regarding the methods of operations of
individuals who distribute drugs.

## II. **PURPOSE OF AFFIDAVIT**

2.     This affidavit is made in support of warrants to search: (1) 21045 Vanowen Street, Apartment 211, Canoga Park, California 91303 (the "SUBJECT PREMISES"), as described more fully in Attachment A-1, which is incorporated herein by reference, and (2) the person of Patrick Dean Van REENEN ("REENEN"), as described more fully in Attachment A-2, for evidence, fruits and instrumentalities of violations of the following statutes, as described more fully in Attachment B, which is also incorporated herein by reference:  18 U.S.C. § 1962(d) (Racketeer Influenced and Corrupt Organization ("RICO") Conspiracy); 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm or Ammunition); 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances); 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances); and 18 U.S.C. § 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information) (collectively, the "Subject Offenses").

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are

related in substance and in part only, with typographical errors
in the original, and all dates and times are approximate.

### III. <u>LEGAL BACKGROUND</u>

4.   Pursuant to 18 U.S.C. § 1962(c):

> It shall be unlawful for any person employed by or
> associated with any enterprise engaged in, or the
> activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or
> indirectly, in the conduct of such enterprise's
> affairs through a pattern of racketeering activity or
> collection of unlawful debt.

Additionally, "[i]t shall be unlawful for any person to conspire
to violate any of the provisions of subsection . . . (c) of this
section."  18 U.S.C. § 1962(d).

5.   Racketeering activity means:

> any act or threat involving murder . . . robbery . . .
> extortion . . . or dealing in a controlled substance
> or listed chemical (as defined in section 102 of the
> Controlled Substances Act), which is chargeable under
> State law and punishable by imprisonment for more than
> one year [or] . . . any act which is indictable under
> any of the following provisions of title 18, United
> States Code . . . section 1028 (relating to fraud and
> related activity in connection with identification
> documents), section 1029 (relating to fraud and
> related activity in connection with access devices)
> . . . section 1341 (relating to mail fraud), section
> 1343 (relating to wire fraud), section 1344 (relating
> to financial institution fraud) [or] . . . the
> felonious manufacture, importation, receiving,
> concealment, buying, selling, or otherwise dealing in
> a controlled substance or listed chemical (as defined
> in section 102 of the Controlled Substances Act),
> punishable under any law of the United States.

18 U.S.C. § 1961(1).

6.   A pattern of racketeering activity

> requires at least two acts of racketeering activity,
> one of which occurred after the effective date of this
> chapter and the last of which occurred within ten
> years (excluding any period of imprisonment) after the
> commission of a prior act of racketeering activity.

18 U.S.C. § 1961(5).  An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   Investigation of REENEN and the San Fernando Valley Peckerwoods

7.   On March 16, 2021, the Honorable Patricia Donahue, United States Magistrate Judge, issued a warrant in Case Number 21-MJ-01298 (C.D. Cal.), authorizing the search of facebook.com/profile.php?id=100025447988634, which is a Facebook account belonging to REENEN (the "TARGET FACEBOOK ACCOUNT"), to search for evidence, contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. § 1962(d) (Racketeer Influenced and Corrupt Organization ("RICO") Conspiracy); and 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances).

8.   On April 7, 2021, the Honorable Alicia G. Rosenberg, United States Magistrate Judge, issued a warrant in Case Number 21-MJ-01673 (C.D. Cal.), authorizing the search of facebook.com/profile.php?id=100000085788721, which is a Facebook account belonging to Kyle Cleveland ("Cleveland"), to search for evidence, contraband, fruits, or instrumentalities of criminal violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances); and 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances).  The signed application for a warrant

4

and underlying affidavit are attached hereto as Exhibit A, and
are incorporated by reference.

9.   As stated in Exhibit A, the San Fernando Valley
Peckerwoods ("SFVPs") are a Racially Motivated Violent Extremist
group that is based in Los Angeles County.  Based on my
knowledge of the investigation as well as my review of Facebook
communications involving SFVPs including REENEN and Cleveland, I
am aware that SFVPs have engaged in criminal activity such as
drug and illegal firearms trafficking and fraud.  I believe that
SFVPs associate together to form a criminal enterprise and
conspire with each other to engage in a pattern of racketeering
activity to include drug trafficking and fraud.  Based on my
knowledge of the investigation and my review of REENEN and
Cleveland's Facebook communications, including those Facebook
communications set forth below and those summarized in Exhibit
A, I believe that REENEN, Cleveland, who is also known to SFVPs
as "Tiny," and others associate together and with individuals
who I believe to be SFVPs to engage in a pattern of racketeering
activity.

10.  As stated in Exhibit A, REENEN has used the TARGET
FACEBOOK ACCOUNT to discuss his drug distribution activities
with Cleveland.  On September 15, 2020, REENEN used the TARGET
FACEBOOK ACCOUNT to discuss with Cleveland the price that they
could obtain drugs to distribute to customers from a source of
supply.  (Ex. A at ¶ 6(a)(1)).  On October 4, 2020, REENEN used
the TARGET FACEBOOK ACCOUNT to ask Cleveland for half an ounce
of fentanyl for a drug customer.  Id. at ¶ 6(a)(4).  On February

24, 2021, REENEN used the TARGET FACEBOOK ACCOUNT to tell
Cleveland that multiple drug customers needed fentanyl, and
REENEN asked Cleveland if Cleveland could supply REENEN with a
quarter of an ounce of fentanyl to distribute.  Id. at
¶ 6(a)(5).  Additionally, as set forth in Exhibit A, in October
2020, REENEN used the TARGET FACEBOOK ACCOUNT to communicate
instructions to a SFVP regarding the need to pay "taxes" to the
Aryan Brotherhood in connection with that SFVP's drug
distribution activities.

     11.  I have reviewed a criminal history report for REENEN.
Based on my review of the criminal history summary, I believe
that REENEN is a convicted felon, and received a three-year
prison sentence in connection with a violation of California
Vehicle Code Section 2800.2 (Grand Theft: Automobile).  I
believe that, as a convicted felon, REENEN is not currently
permitted to possess firearms or ammunition.

     **B.   Investigation of the SUBJECT PREMISES**

     12.  Based on my review of the contents of the TARGET
FACEBOOK ACCOUNT, I am aware that REENEN has told multiple
Facebook users that his current address is the SUBJECT PREMISES.
He told one Facebook user that his address was 21045 Vanowen
Street as recently as January 31, 2021.  On February 28, 2021,
REENEN provided another Facebook user with his full address of:
"21045 vanowen st Apt 211," which is the address of the SUBJECT
PREMISES.

     13.  Based on my review of a report prepared by FBI Task
Force Officer ("TFO") Richard Morton and my communications with

TFO Morton, as well as my review of the contents of the TARGET FACEBOOK ACCOUNT I am aware of the following:

a.   On April 23, 2021, TFO Morton interviewed Property Manager P.K., who manages the Warner Courtyard Apartments that are located at 21045 Vanowen Street in Canoga Park, California.  TFO Morton showed P.K. a picture of REENEN, and asked P.K. if he recognized REENEN as living in the complex.  P.K. said that the individual looked familiar, and asked TFO Morton for the name of the individual.  When TFO Morton said that the individual was named "Patrick Van REENEN," P.K. said that he did not recognize REENEN's name.  TFO Morton told P.K. that the individual may be driving a black or a red motorcycle, and P.K. said that he believed that a white male who drives a motorcycle resides in unit 211.

b.   P.K. informed TFO Morton that apartment 211 was rented on September 1, 2020 via an online rental application. The renter provided a California Driver's License (D7094970), which depicts the name "Eric Ray Blair," with a date of birth of August 13, 1965.  P.K. provided TFO Morton with a copy of the Driver's License submitted with the online application.  The individual pictured on the license appears to be in his late 20's or early 30's, despite listing a birth date of 1965.

c.   P.K. accessed the on-site surveillance camera system for 21045 Vanowen Street, and located a recent surveillance video of the resident of unit 211 pulling into the west parking gate on a red motorcycle.  The individual riding the motorcycle was not wearing a helmet or a mask.  Upon zooming

in on the picture, TFO Morton was able to identify the
individual riding the motorcycle as REENEN.  As set forth below,
REENEN is able to generate false California identification
documents, and I believe he generated a false California
Driver's License in order to submit a rental application in a
false name.[1]

          d.    P.K. informed TFO Morton that REENEN made the
first payment for rent associated with unit 211 in October 2020
online via a corporate account.  REENEN made a second online
payment in November 2020 from an account that was under the name
of "Jose Gonzales."  As the name "Jose Gonzales" was not
associated with the lease agreement for the unit, P.K. informed
REENEN that a payment from that account would no longer be
accepted.  REENEN made a third online payment in December 2020
using the original corporate account, however the payment was
returned due to insufficient funds in the account.  P.K.
informed REENEN that future payments could only be made by a
cashier's check.  REENEN has not made any rental payments since
November 2020.

          e.    P.K. told TFO Morton that more than one
individual who resides in a unit close to unit 211 has
complained about heavy foot traffic coming and going from unit

---

[1] Additionally, based on my review of the contents of the
TARGET FACEBOOK ACCOUNT, I am aware that on August 25, 2020,
less than a week before REENEN rented the apartment unit, he
sent a photograph of what appears to be a fake California
Driver's License (D7094970) to Facebook user Z.W.  The name on
the Driver's License is also "Eric Ray Blair," however the date
of birth on that likely false license is 03/15/1988 as opposed
to 1965.

211, and has described the individuals coming and going as
skinny white guys with numerous tattoos.  Additionally, P.K.
said that an occupant of a unit close to unit 211 has complained
of a chemical smell coming from unit 211.

### C.    REENEN Uses the TARGET FACEBOOK ACCOUNT in Connection with the Subject Offenses

14.  Based on my review of the contents of the TARGET
FACEBOOK ACCOUNT, I am aware of the following:

1.    <u>September 26-27, 2020 Facebook Communication</u>

a.    Based on my review of the contents of TARGET
FACEBOOK ACCOUNT, I am aware that between September 26, 2020 and
September 27, 2020, REENEN and Facebook user S.G. engaged in the
following Facebook message exchange:

> S.G.:  Utility bill template?  Passport template
>
> REENEN:  Do you need them?
>
> S.G.:  Plz
>
> REENEN:  Yeah they are on my computer i will get
> them to you when i get home.  Or i have utility
> bill maybe now let me see.
>
> S.G.:  Ty.
>
> S.G.:  ?
>
> REENEN:  My bad knocked out i got you.  Right now
> im sorry man.
>
> S.G.:  Ty.  What U upto
>
> REENEN:  Getting on my laptop to give you bill.
> What kind of bill do you want
>
> S.G.:  Lol.  Dwp or whatever for verification

REENEN:  How bout att bill or bank of america
statement

S.G.:  Ok.  Take both

REENEN:  Ok

S.G.:  Ty.

REENEN then sent an attachment to S.G. called
ViewStatement.pdf.

S.G.:  And passport plz

REENEN:  My id template and passport template
were on my phone and last night when the cops
rolled up on me i factory reset my phone I have
to buy them again with bitcoin and i dont have
enough to do that right now

S.G.:  I'll send cash if needed.

REENEN then sent S.G. an attachment called ET
VERIZON BILL (1).pdf.

REENEN:  that Verizon bill is by far the easiest
to use.  I need hold on ill tell you how much
bitcoin I need.  Its a hundred bucks

S.G.:  Kk 10 min.  How u want it

REENEN:  Umm whats easier for you

    b.    Later in the thread, REENEN and S.G. engaged in
the following Facebook message exchange:

REENEN:  Want the templates ?  I got passpkrt and
cali

S.G.: Yes plz

REENEN:  K one sex3.  Sec*

10

S.G.:  ?

REENEN:  Coming now 2 minutes.

REENEN then sent S.G. an attachment called
California New front & back-Recovered.psd.

REENEN:  I need your email for passport its too
big to send here

REENEN:  ?

S.G.:  [Seang*******44@gmail.com]

c.    Based on my training, experience, and knowledge
of the investigation, I believe that, during this Facebook
message exchange, S.G. asked REENEN if REENEN had templates to
create utility bills and passports with false information.
Based on my training and experience, I am aware that utility
bills are used to verify an individual's residency because they
have a name, an address, and a date, which makes them an easy
way to prove that someone is actively paying for utilities at a
specific address.  I believe that S.G. was attempting to
generate a fraudulent utility bill in connection with a fraud
scheme that S.G. was involved in at the time.  I also believe,
based on the Facebook message exchange, that S.G. and REENEN
worked together to obtain templates in order to generate false
California identification documents and passports.  Finally, I
believe that REENEN told S.G. that he needed to use bitcoin in
order to purchase the templates to create false identifications
and false passports from the individual who was supplying the
templates for the false identification documents.

2.    September 27, 2020 Facebook Communication

a.    Based on my review of the contents of the TARGET
FACEBOOK ACCOUNT, I am aware that on September 27, 2020, REENEN
and Facebook user S.G. engaged in the following Facebook message
exchange:

> REENEN:  Ok. Can i ask you a favor? Do you have
> any straps right now
>
> S.G.:  Yes
>
> REENEN:  I need to borrow one for like an hour
> man i can leave you collateral this fool took
> some shit from me and i need to get it bacl.  I
> wouldnt ask if i really didnt need it
>
> S.G.:  I got u

b.    Based on my training, experience, and knowledge
of the investigation, I believe that, during this Facebook
message exchange, REENEN asked S.G. if REENEN could borrow a
firearm, or "strap," and offered to leave an item of value with
S.G. as collateral.  I believe that S.G. agreed to let REENEN
borrow a firearm that REENEN intended to use to confront another
individual.

3.    September 27, 2020 Facebook Communication

a.    Based on my review of the contents of the TARGET
FACEBOOK ACCOUNT, I am aware that on September 27, 2020, REENEN
and Facebook user S.G. engaged in the following Facebook message
exchange:

> REENEN:  Did you get that passport one.  The
> template?

12

> S.G.:  Yes
>
> REENEN:  You might have trouble editing the
> california id it can be difficult and it has to
> be done on photoshop if you need help i got you
> where csn i bring your piece back at?
>
> S.G.:  My air bnb please.  On bluff side
>
> REENEN:  Ok be there within hour

     b.    Based on my training, experience, and knowledge of the investigation, I believe that, during this Facebook message exchange, REENEN asked S.G. if he had received the template for generating false California identification documents, and S.G. stated that he had.  I believe REENEN offered to help S.G. generate false identification documents if S.G. needed assistance, and also asked S.G. where REENEN could meet him to return S.G.'s firearm, or "piece."

     4.    <u>October 3, 2020 Facebook Communication</u>

     a.    Based on my review of the contents of the TARGET FACEBOOK ACCOUNT, I am aware that on October 3, 2020, REENEN and Facebook user S.G. engaged in the following Facebook message exchange:

> S.G.:  Can u grab something from tiny on way back
>
> REENEN:  Yeah what do you need
>
> S.G.:  Its a qp
>
> REENEN:  Quarter pound ?
>
> S.G.:  Ya.  U got cash?  I have it here

REENEN:  You talk to him already or no?  How much
you trying to spend?  Ya ill probably come get
the cash first hang on ill ask him right now

S.G.:  Kk eithwr way

REENEN:  K.  One minute waiting for him to
respond

S.G.:  Kk...ty

REENEN:  For sure

S.G.:  How long

REENEN:  Hold on he hasnt answered me im calling
again.  I asked him he said shorty was suppose to
come grab it or is this a different qp lol.  Just
got to tinys

S.G.:  Kk

b.    Based on my training, experience, and knowledge
of the investigation, I believe that, during this Facebook
message exchange, S.G. asked REENEN to pick up a quarter pound
of drugs from Cleveland and deliver that quantity of drugs to
S.G.  I believe REENEN agreed to pick up and deliver the drugs,
and also let S.G. know that he had just arrived at Cleveland's
residence.

5.    October 5, 2020 Facebook Communication

a.    Based on my review of the contents of the TARGET
FACEBOOK ACCOUNT, I am aware that on October 5, 2020, REENEN and
Facebook user S.G. engaged in the following Facebook message
exchange:

REENEN:  Im here

14

S.G.:  Meet my pad.  I gotta get back.  Just
found major shit out

REENEN:  Ok ill be there in 25 to 30 sorry im
taking a shit then im on the way.  Should i bring
anthony or my strap?  Or both

S.G.:  Both

REENEN:  Ok ill be leaving soon

S.G.:  Scratch tgat.  My place no good

REENEN:  What do you mean

S.G.:  Give me.  Asec.  The blvd studio city just
u.  Going to shorty room.

REENEN:  Ok leaving in 10.  Im done

S.G.:  The blvd

REENEN:  Ok. I really need to find someone who
can fix my light on my bike

S.G.:  I got u

REENEN:  Im stuck here till tiny gets up man i
got all of his shit drugs everything on me i cant
leave it here i have nowhere to put it thwt will
be safe.  And im not driving with thst shit again

S.G.:  Lol.  Bring a gram of his phent for me
also my guy wants to try it

REENEN:  Yeah i got it.  Ill hit you up when i
leave.

    b.   Based on my training, experience, and knowledge
of the investigation, I believe that, during this Facebook
message exchange, S.G. informed REENEN that he needed to meet

with REENEN, and REENEN offered to bring his firearm, or "strap," to the meeting.  I also believe that, later in the Facebook message exchange, REENEN told S.G. that he was having difficulty traveling to meet S.G. because REENEN had to watch Cleveland's drugs and not leave them unattended, and was concerned about driving with the drugs in his possession. Finally, I believe S.G. instructed REENEN to supply S.G. with a gram of Cleveland's fentanyl so that a prospective drug customer could sample the drugs.  I believe REENEN agreed to provide S.G. with a sample of the fentanyl.

      6.   <u>October 27-28, 2020 Facebook Communication</u>

      a.   Based on my review of the contents of the TARGET FACEBOOK ACCOUNT, I am aware that on October 27, 2020 and October 28, 2020, REENEN and Facebook user S.G. engaged in the following Facebook message exchange:

> S.G.:  Really need those papers done if can ?
> REENEN: I'll be back I gotta go to the store to get something for breakfast
> S.G.:  A utili bill for proof of address plz
> REENEN:  Yeah.  So for what address.  The one. On the w2
> S.G.:  Thee 147 beach rd
> REENEN:  Ok

      b.   Based on my training, experience, and knowledge of the investigation, I believe that, during this Facebook message exchange, S.G. asked REENEN to help him generate a false

utility bill that would have an address that would match an
address on a W2 form, and REENEN agreed to assist.

       7.   December 15-16, 2020 Facebook Communication

       a.   Based on my review of the contents of the TARGET
FACEBOOK ACCOUNT, I am aware that between December 15, 2020 and
December 16, 2020, REENEN and Facebook user R.R. engaged in the
following Facebook message exchange:

          R.R.:  Pat do you know michelle myers?

          REENEN:  Yeah i do

          R.R.:  Ok is it cool if i give her your number?
          She wants to work with you theres money in it and
          shes done it before.  She just needs documents
          made or checks or something and i thought of you

          REENEN:  Yeah please do she's cool?  I haven't
          met her I just know about her

          R.R.:  Shes real cool dogg like a street mom to
          me and henisi but shes one of the coolest people
          i know.  Came out of pocket for monsters bail all
          500 was her.  And dont even want it back.
          Alright ill give it to her.  N ya i vouch for her
          100 percent on anything

          REENEN:  Awesome tell her to hit me up asap I'm
          down to make some money any time bro appreciate
          you

          R.R.:  Of course and i will

          REENEN:  I got three packs of black all day for
          $100.  If you know anyone

R.R.:  Alright if anyone needs ill send them your
way.  My girl is super picky otherwise wed go
through you.  Im stuck dealing with people I dont
even like.... haha but for sure ill send anyone
else your way

REENEN:  I got some bomb shit different when I
come over I'll let you guys try it

R.R.:  If she likes it ill 100% go through you.
I dont really care for Persian sean, not my
cousins biggest fan right now, shits been weird
with spinner ever since i got with shy and the
only other persons dope she likes is earl watts.
And hes alright but boy does he lag.  So ya if
she likes it 100%

b.  Based on my training, experience, and knowledge
of the investigation, I believe that, during this Facebook
message exchange, R.R. informed REENEN that an individual,
Michelle Myers ("Myers"), was interested in participating in a
fraud scheme with REENEN, and that, if REENEN would assist Myers
make false identification documents or fraudulent checks, REENEN
could make money from the fraud scheme.  I believe that, after
R.R. vouched for Myers as a trustworthy criminal co-conspirator,
REENEN agreed to help Myers with her fraud scheme in order to
make money himself.  Based on my training, experience, and
knowledge of the investigation, I also believe that, during this
Facebook message exchange, REENEN informed R.R. that he had
heroin, or "black," to sell to customers, and asked R.R. to

18

refer any heroin customers to him.  I believe that R.R. agreed, and also mentioned that he and his significant other would purchase heroin directly from REENEN, however his significant other was selective about the quality of heroin they purchased. I believe that, in response, REENEN assured R.R. that he had different better quality heroin, and would give R.R.'s significant other a sample.  I believe that R.R. responded that, if his significant other liked the quality of the heroin that REENEN supplied, they would purchase heroin directly from REENEN in the future.

        8.   <u>December 17, 2020 Facebook Communication</u>

        a.   Based on my review of the contents of the TARGET FACEBOOK ACCOUNT, I am aware that on December 17, 2020, REENEN and Facebook user M.H. engaged in the following Facebook message exchange:

> REENEN:  I've got 4 ounces of heroin and I really can't sell it do you know anyone that would buy it I will hook it up I just need to get rid of it my boy went to jail and left it to me and I promised to put the money on his books
>
> M.H.:  how much?
>
> REENEN:  For the ounce or all of it
>
> M.H.:  both
>
> REENEN:  My cost is 550.  I've got about two left
>
> M.H.:  550 an oz?
>
> REENEN:  yes
>
> M.H.:  then why did you say 4.  lol.  Silly

REENEN:  I've got 56 grams

M.H.:  is it tar?  powder?

REENEN:  Powder

M.H.:  pic?

REENEN:  It's bomb I mean everyone likes it but everyone out here is on fetanyl.  Yeah I'll send one right now

M.H.:  I'll take it.  can you bring it now.  the rest of the 56 grams.  or you want me to come get it?  lreferably can you bring it

REENEN sent M.H. the following image:



REENEN:  I'm gonna weigh it now

M.H.:  nm

REENEN:  ?

REENEN:  52.4 grams

Based on my training, experience, and knowledge of the investigation, I believe that, during this Facebook message exchange, REENEN agreed to sell M.H. 52.4 grams of heroin and sent M.H. a picture of the heroin that she was purchasing.

20

9.    January 16, 2021 Facebook Communication

a.    Based on my review of the contents of the TARGET
FACEBOOK ACCOUNT, I am aware that on January 16, 2021, REENEN
and Facebook user R.R. engaged in the following Facebook message
exchange:

> REENEN:  You know risky I don't even know how to
> explain my situation right now.  Everyone always
> hits me up with there issues and I always am one
> to just take care of it and I'm having a serious
> issue right now I got no one at my pad and all my
> shit in a room unattended with boogy in my house
> and I can't get ahold of anyone.  To watch my
> room for me or to go there until I can find a
> fucking ride it's crazy man
>
> R.R.:  I can help.  Ill go with you if you want

b.    Later in the thread, R.R. and REENEN engaged in
the following Facebook message exchange:

> REENEN:  21045 vanowen st.  Canoga Park
>
> R.R.:  Im omw leaving right this second im
> bringing my 9 too
>
> REENEN:  Okay cool risky thank you I got your
> piece right here
>
> R.R.:  I got you bro just dont start without me.
> My 9s a lot quieter and already dirty.
>
> REENEN:  Im omw
>
> R.R.:  Okay risky thank you

21

c.   Based on my training, experience, and knowledge of the investigation, I believe that, during this Facebook message exchange, REENEN informed R.R. that REENEN had a serious issue that he needed to address involving his activities as an SFVP, but was unable to leave the SUBJECT PREMISES because he had no one available to guard the contraband in his bedroom in order to prevent anyone from stealing it while REENEN was gone. Based on my training and experience, I further believe that REENEN provided R.R. with an address of the SUBJECT PREMISES, and R.R. informed REENEN that he was coming immediately and bringing his 9mm firearm.  I also believe that REENEN told R.R. that REENEN had a firearm, or "piece," already available at the SUBJECT PREMISES for R.R. to use.  Finally, I believe that R.R. informed REENEN that he would bring his 9mm firearm because it was quieter when it was fired, and was already "dirty," meaning that it had already been fired in connection with a crime. Based on R.R.'s statements about his firearm, I believe that R.R. was prepared to shoot at another individual on this date.

10.   January 21, 2021 Facebook Communication

a.   Based on my review of the contents of the TARGET FACEBOOK ACCOUNT, I am aware that on January 21, 2021, REENEN and Facebook user R.R. engaged in the following Facebook message exchange:

REENEN:  My boy has these for sale I didn't know if you would be interested

REENEN sent the following images:

 

> R.R.:  How much
>
> REENEN:  Well he wants $1000 a piece but I'm definitely known for pulling a deal if it was something you were interested in I could probably get a good deal he owes me one anyway for sure
>
> R.R.:  Yeah see thats too much.  Maybe 500 but not 1000
>
> REENEN:  I know a thousand is to much but realistically I was thinking 700 750 would be a good deal.  I mean I could for sure swing that $500 I don't think I could do that
>
> R.R.:  Ok ill let u know
>
> REENEN:  Cool

    b.    Based on my training, experience, and knowledge of the investigation, I believe that, during this Facebook message exchange, REENEN informed R.R. that REENEN knew an individual who was willing to sell two firearms.  I believe REENEN and R.R. discussed the price of the firearms, and R.R.

told REENEN that he would let REENEN know if he wanted to
purchase them.

                11.   March 14, 2021 Facebook Communication

                a.   Based on my review of the contents of the TARGET
FACEBOOK ACCOUNT, I am aware that on March 14, 2021, REENEN and
Cleveland engaged in the following Facebook message exchange:

                REENEN:  Hey.

                Cleveland:  Hey.

                REENEN:  So he said it's 3400 for 4 remember he
wants $900 an ounce but he said your getting two
he will do the lowest $850 which is an extra $100
I'll pay for it I have the cash just if you want
to take it off what I owe you and just let me
know if I should get it or not.

                Cleveland:  I guess.  I'm guna have to find new
connect tho.  Prices go down not up.  I know it's
not u.

                REENEN:  Yeah I figured I mean trust I want you
to find a new one too I'm all about you getting
it for cheaper.  He told me at $10000 will be a
lot cheaper.

                Cleveland:  Like?  Half key?

                REENEN:  Well he's saying for like $10,000 the
ounce will go down to like $600 to $650.  This
stuff is called bunny ears 3000 he said it's the
best.  Better then xr.

                Cleveland:  Lol.  Forsure.  Jessica rabbit.

b.   Based on my training, experience, and knowledge of the investigation, I believe that, during this Facebook communication, REENEN and Cleveland discussed the price of drugs that they could purchase from a source of supply, and the need to get a new source of supply for drugs, or a new "connect."

## V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

15.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In

addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

       d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

       e.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

       f.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

       g.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to

diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

16.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.  Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.    Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII. TRAINING AND EXPERIENCE ON BANK FRAUD, IDENTITY THEFT, AND ACCESS DEVICE FRAUD

17.  Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft crimes, I know the following:

a.    People involved in identity theft and access device fraud crimes often collect checks, access devices, other personal identifying information (such as names, Social Security

numbers, and dates of birth), and identification documents
belonging to other people that they can use to fraudulently
obtain money and items of value.  It is a common practice for
those involved in such crimes to use either false identification
or stolen real identification to make purchases with stolen
access devices at in order to avoid detection and to complete
the transaction.  Those who engage in such fraud keep evidence
of such fraudulent transactions.

        b.   It is common for identity thieves, and
individuals engaged in access device fraud and identification
document fraud to use equipment and software to print credit and
identification cards, to create magnetic strips for credit
cards, to use embossing machines to create credit cards, to use
laser printers to create checks, and to use magnetic card
readers to read and re-encode credit cards.  Software relevant
to such schemes can often be found on digital devices, such as
computers.  Such equipment and software are often found in the
thieves' possession as they can be small and easily portable.

        c.   It is common practice for individuals involved in
identity theft and access device fraud crimes to possess and use
multiple digital devices at once.  Such digital devices are
often used to facilitate, conduct, and track fraudulent
transactions and identity theft.  Suspects often use digital
devices to perpetrate their crimes due to the relative anonymity
gained by conducting financial transactions electronically or
over the internet.  They often employ digital devices for the
purposes, among others, of: (1) applying online for fraudulent

29

credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; (6) verifying the status of stolen access devices; and (7) coordinating with co-conspirators.

d.    Based on my training and experience, I know that individuals who participate in identity theft and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

e.    Because REENEN's crimes involved the use of bitcoin, the items to be seized could be stored almost anywhere within a residence, in both physical and electronic formats. For example, Attachment B seeks bitcoin addresses, bitcoin private keys, bitcoin root keys, PGP keys, and passwords.  These pieces of data comprise long and complex character strings, and in my training and experience I know that many virtual currency users write down or otherwise record and store such items

because they are too long to commit to memory.  As such, these keys, passwords, and addresses may be documented in writing and secreted anywhere within a residence.  For all of the foregoing reasons, I respectfully submit that probable cause exists to believe that such records, data, and documents will be found within the SUBJECT PREMISES, including in computers or on other devices that store electronic data.

### VIII.      TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

18. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary

_____

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

32

develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

19. Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a. Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction. Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above. Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

b. Digital devices capable of storing multiple
gigabytes are now commonplace. As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

20. The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress REENEN's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of REENEN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

34

## IX. <u>CONCLUSION</u>

21.  For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at the SUBJECT PREMISES and on the SUBJECT PERSON, as described in Attachments A-1 and A-2.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
April, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT A

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of:<br>Information associated with account identified as<br>facebook.com/profile.php?id=100000085788721 that<br>is within the possession, custody, or control of<br>Facebook Inc. | )<br>)<br>)<br>)<br>)<br>)    Case No. 21-MJ-01673 |

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code section(s) | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |
| 21 U.S.C. § 846 | Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

/s/
*Applicant's signature*

Merrilee Goodwin, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: April 7, 2021

*Judge's signature*

City and State: Los Angeles, CA

Alicia G. Rosenberg, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

PROPERTY TO BE SEARCHED

     This warrant applies to information associated with the SUBJECT ACCOUNT identified as facebook.com/profile.php?id=100000085788721 that is within the possession, custody, or control of Facebook Inc., a company that accepts service of legal process at 1601 Willow Road, Menlo Park, CA 94025, regardless of where such information is stored, held, or maintained.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

I.    **SEARCH PROCEDURES**

1.    The warrant will be presented to personnel of Facebook Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.  The review of the electronic data may

be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6. The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant. The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7. Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court. Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.   Pursuant to <u>18 U.S.C. § 2703(g)</u> the presence of an agent is not required for service or execution of this warrant.

**II.   INFORMATION TO BE DISCLOSED BY THE PROVIDER**

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under <u>18 U.S.C. § 2703(f)</u>, the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred between June 1, 2020 and the date of this warrant,[3] including:

i.   All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account,

---

[3] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

draft messages, deleted messages, and messages maintained in
trash or any other folders or tags or labels, as well as all
header information associated with each email or message
(including the actual IP addresses of the sender and recipients
of the emails), and any related documents or attachments.

        ii.  All records or other information stored by
subscriber(s) of the SUBJECT ACCOUNT, including address books,
contact and buddy lists, calendar data, pictures, videos, notes,
texts, links, user profiles, account settings, access logs, and
files.

        iii. All records pertaining to communications
between the PROVIDER and any person regarding the SUBJECT
ACCOUNT, including contacts with support services and records of
actions taken.

      b.  All other records and information, including:

        i.  All subscriber information, including the
date on which the account was created, the length of service,
the IP address used to register the account, the subscriber's
full name(s), screen name(s), any alternate names, other account
names or email addresses associated with the account, linked
accounts, telephone numbers, physical addresses, and other
identifying information regarding the subscriber, including any
removed or changed names, email addresses, telephone numbers or
physical addresses, the types of service utilized, account
status, account settings, login IP addresses associated with
session dates and times, as well as means and source of payment,
including detailed billing records, **and including any changes**

v

**made to any subscriber information** or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

>> (I)  the SUBJECT ACCOUNT.

>> ii.  All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

**III. INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.  For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

>> a.  All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances); and 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances) (the "SUBJECT OFFENSES"), namely:

>> i.  Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.   Information related to how and when the
SUBJECT ACCOUNT was accessed or used;

iii. Information relating to the purchase, sale,
distribution, possession and/or procurement of controlled
substances, and the advertisement of controlled substances for
sale;

iv.   Information relating to the proceeds of the
sale or distribution of controlled substances;

v.   Information relating to co-conspirators
engaged in the SUBJECT OFFENSES, which could include information
relating to their identities, whereabouts, communications, and
methods of contact and communication; and

b.   All records and information described above in
Section II.10.b.

**IV.   PROVIDER PROCEDURES**

12.   IT IS ORDERED that the PROVIDER shall deliver the
information set forth in Section II within 10 days of the
service of this warrant.   The PROVIDER shall send such
information to:

FBI Special Agent Merrilee Goodwin
(310) 420-5091
MRGOODWIN@fbi.gov

13.   IT IS FURTHER ORDERED that the PROVIDER shall provide
the name and contact information for all employees who conduct
the search and produce the records responsive to this warrant.

IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b),
that the PROVIDER shall not notify any person, including the
subscriber(s) of each account identified in Attachment A, of the

existence of the warrant, until further order of the Court,
until written notice is provided by the United States Attorney's
Office that nondisclosure is no longer required, or until one
year from the date this warrant is signed by the magistrate
judge or such later date as may be set by the Court upon
application for an extension by the United States.  Upon
expiration of this order, at least ten business days prior to
disclosing the existence of the warrant, the PROVIDER shall
notify the agent identified in paragraph 12 above of its intent
to so notify.

## **AFFIDAVIT**

I, Merrilee Goodwin, being duly sworn, declare and state as follows:

### I. **INTRODUCTION**

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI").  I have been a Special Agent with the FBI since 1998.  I am currently assigned to a Domestic Terrorism Squad of the Los Angeles Field Office, where I primarily investigate people who commit violent criminal acts in furtherance of their political or social ideology, and investigate threats associated with the nefarious use of chemical, biological, radiological, nuclear, and explosive materials.  In this capacity, I investigate federal crimes as it pertains to terrorism, and have gained experience in cyber-based matters including those involving dark web markets.  As a result, I am familiar with the methods used by criminals in furtherance of their criminal activities in both the virtual and physical worlds, and I have received both formal and informal training from the FBI and other institutions regarding cyber and computer crime investigations and review of digital devices.  As a Special Agent, I completed the FBI Academy in Quantico, Virginia, and received training to include the fundamentals of law, ethics, interviewing, report writing, firearms, surveillance, defensive tactics, and case management.  I have also received training regarding the methods of operations of individuals who distribute drugs.

2.    I make this affidavit in support of an application for a warrant for information associated with the account identified as facebook.com/profile.php?id=100000085788721 (the "SUBJECT ACCOUNT") that is stored at premises controlled by Facebook Inc. (the "PROVIDER"), a provider of electronic communication and remote computing services, headquartered at 1601 Willow Road, Menlo Park, CA 94025.[1]  The information to be searched is described in Attachment A.  This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records *(footnote cont'd on next page)*

to disclose to the government copies of the information
(including the content of communications) described in Section
II of Attachment B.  Upon receipt of the information described
in Section II of Attachment B, law enforcement agents and/or
individuals assisting law enforcement and acting at their
direction will review that information to locate the items
described in Section III of Attachment B.  Attachments A and B
are incorporated herein by reference.

      3.    As described more fully below, I respectfully submit
there is probable cause to believe that the information
associated with the SUBJECT ACCOUNT constitutes evidence,
contraband, fruits, or instrumentalities of criminal violations
of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute
Controlled Substances); and 21 U.S.C. § 846 (Conspiracy to
Possess with Intent to Distribute and Distribute Controlled
Substances).

      4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from other agents and witnesses.  This
affidavit is intended to show merely that there is sufficient
probable cause for the requested warrant and does not purport to
set forth all of my knowledge of or investigation into this
matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are

---

and other records and information that do not contain content
(see Attachment B paragraph II.10.b.).

related in substance and in part only, with typographical errors
in the original, and all dates and times are approximate.

## II. STATEMENT OF PROBABLE CAUSE

### A.    Identification of the User of the SUBJECT ACCOUNT

5.    Based on my review of publicly available information
posted on the SUBJECT ACCOUNT as well as my knowledge of this
investigation, I believe that the user of the SUBJECT ACCOUNT is
Kyle Cleveland ("CLEVELAND").

a.    The user of the SUBJECT ACCOUNT lists his user
name as "Kyle CLEVELAND."

b.    Additionally, I have reviewed a photograph of
CLEVELAND that is on file with the California Department of
Motor Vehicles and have compared that photograph with Facebook
profile pictures of the user of the SUBJECT ACCOUNT.  The
SUBJECT ACCOUNT's profile pictures appear to be pictures of
CLEVELAND.

### B.    CLEVELAND Uses the SUBJECT ACCOUNT in Connection with Drug Distribution Activities

6.    Based on my knowledge of the investigation, including
my review of communications CLEVELAND sent using the SUBJECT
ACCOUNT, I am aware of the following:

a.    On March 16, 2021, the Honorable Patricia
Donahue, United States Magistrate Judge, issued a warrant in
Case Number 21-MJ-01298 (C.D. Cal.), authorizing the search of
facebook.com/profile.php?id=100025447988634, which is a Facebook
Account belonging to Patrick Reenen ("Reenen"), to search for
evidence, contraband, fruits, or instrumentalities of criminal

violations of <u>18 U.S.C. § 1962(d)</u> (Racketeer Influenced and
Corrupt Organization ("RICO") Conspiracy); and <u>21 U.S.C. § 846</u>
(Conspiracy to Possess with Intent to Distribute and Distribute
Controlled Substances).   The signed warrant and affidavit are
attached hereto as Exhibit 1, and are incorporated by reference.

      1.   <u>September 15, 2020 Facebook Communications</u>

      a.   Based on my review of the contents of Reenen's
Facebook account, I am aware that on September 15, 2020,
CLEVELAND and Reenen engaged in the following Facebook message
exchange:

      i.   CLEVELAND:  Need that.  Like right now.

      ii.  Reenen:  Whats a realistic price your
paying.

      iii. CLEVELAND:  750 800.

      iv.  Reenen:  Thought it was 850.  For 1.  So i
might not be able to help.

      v.   CLEVELAND: Yesterday that's what I paid.

      vi.  Reenen:  My bad i thought you were paying
850 ill find out right now.

      vii.  CLEVELAND:  But I was paying 8 n it was
suppose to go to 750.  But both my guys got busted.

      viii.    Reenen:  I might be able to get it for
800 i mean if you buy multiple i might be able to get the price
dropped.

      ix.  CLEVELAND:  Can u get them to 8 I'll get 10-
20.  750 would b nice.

      x.   Reenen:  Okay.  Let me see.

xi.  CLEVELAND:  Thx.

xii. Reenen:  Ill call you when i find out.

b.   Based on my training, experience, and knowledge
of the investigation, I believe that, during this Facebook
communication, CLEVELAND informed Reenen that his drug sources
of supply were "busted," meaning arrested, and CLEVELAND asked
Reenen if he could get drugs from Reenen's drug source of supply
for $750 or $800 per unit.  I believe that Reenen informed
CLEVELAND that CLEVELAND would need to buy multiple units of the
drug in order to obtain the drugs at less than $850 per unit,
and CLEVELAND agreed to buy ten to twenty units of the drug if
he could get the units at $800 per unit.  I believe that Reenen
agreed to ask his drug source of supply if CLEVELAND could get
that quantity of drugs at the lower price.

2.   September 19, 2020 Facebook Communications

a.   Based on my review of the contents of Reenen's
Facebook account, I am aware that on September 19, 2020,
CLEVELAND and Reenen engaged in the following Facebook message
exchange:

i.   Reenen:  My boy wanted a piece of black how
much?

ii.  CLEVELAND:  I love you homeboy.  650.

iii. Reenen:  Its all good im sorry to love you.
Too.  Alright ill tell him right noe.

b.   Based on my training, experience, and knowledge
of the investigation, I believe that, during this Facebook
communication, Reenen informed CLEVELAND that he knew an

individual who wanted a "piece of black," meaning an ounce of heroin.  I believe that CLEVELAND informed Reenen that the price for an ounce of heroin for that customer was $650.

        3.   <u>September 25-26, 2020 Facebook Communications</u>

        a.   Based on my review of the contents of Reenen's Facebook account, I am aware that on September 25-26, 2020, CLEVELAND and Reenen engaged in the following Facebook message exchange:

        i.   Reenen:  Hey i need a bunch of coke boogies boy wants a quarter pound of it.

        ii.  CLEVELAND:  I don't think I can.  U get ur money from bailee yet.

        iii. Reenen:  Nope shes suppose to meet me at kohls.

        iv.  CLEVELAND:  When.

        v.   Reenen:  Fuck i thought now but i guess not.

        b.   Based on my training, experience, and knowledge of the investigation, I believe that, during this Facebook communication, Reenen informed CLEVELAND that a customer wanted a quarter of a pound of cocaine, and asked if CLEVELAND could supply that amount.  I believe that CLEVELAND said that he did not believe that he could, and also asked questions to see if Reenen presently had money to pay for the cocaine.  I believe Reenen confirmed that he had not yet received money from another drug customer.

4.   October 11, 2020 Facebook Communications

a.   Based on my review of the contents of Reenen's Facebook account, I am aware that on October 11, 2020, CLEVELAND and Reenen engaged in the following Facebook message exchange:

i.   Reenen:  Yo I need half oz of fetanyl my boy pays $600.  I'm trying to make a little something off of it let me know what you can do it for.

ii.   In response to this message, CLEVELAND placed a Facebook call to Reenen using the SUBJECT ACCOUNT.

b.   Based on my training, experience, and knowledge of the investigation, I believe that, during this Facebook communication, Reenen informed CLEVELAND that a drug customer needed half an ounce of fentanyl and Reenen wanted to obtain the fentanyl from CLEVELAND and also make a profit from the sale to the customer.  I believe that CLEVELAND placed a Facebook call to Reenen in order to discuss the potential fentanyl sale.

5.   February 24, 2021 Facebook Communications

a.   Based on my review of the contents of Reenen's Facebook account, I am aware that on February 24, 2021, CLEVELAND and Reenen engaged in the following Facebook message exchange:

i.   Reenen:  Got money for you.  [I don't know] what your situation is with the fetty but I've had like 3 people hit me up for it today if you can front me a quarter would be dope.

ii.   CLEVELAND:  Ok.

8

b.   Based on my training, experience, and knowledge
of the investigation, I believe that, during this Facebook
communication, Reenen informed CLEVELAND that multiple drug
customers needed fentanyl, and Reenan asked CLEVELAND if he
could supply a quarter of an ounce of fentanyl.  Reenan also
assured CLEVELAND that he had money for the drugs.  I believe
that CLEVELAND agreed to supply Reenan with a quarter ounce of
fentanyl.

### III.  BACKGROUND ON SOCIAL MEDIA ACCOUNTS AND THE PROVIDER

7.   Based on a review of information provided by Facebook
regarding its services and data retention policies, information
provided by other FBI Special Agents, and/or my training and
experience, I am aware of the information contained in this
section of the affidavit regarding Facebook.

8.   Facebook owns and operates a free-access social
networking website of the same name that can be accessed at
http://www.facebook.com.  Facebook allows its users to establish
accounts with Facebook, and users can then use their accounts to
share written news, photographs, videos, and other information
with other Facebook users, and sometimes with the general
public.

9.   Facebook asks users to provide basic contact and
personal identifying information to Facebook, either during the
registration process or thereafter.  This subscriber information
may include the user's full name, any alternate names such as a
maiden name or nickname, birth date, gender, contact e-mail

addresses (including deleted addresses), Facebook passwords,
Facebook security questions and answers (for password
retrieval), physical address (including city, state, and zip
code), telephone numbers, screen names, websites, and other
personal identifiers.  Facebook stores both current and prior
information, such as past addresses or names provided by a user.
Facebook also assigns a user identification number to each
account.  Facebook also allows users to "link" other accounts
(i.e., accounts maintained at other providers of e-mail or
social media services) to their Facebook accounts, and stores
information about these linked accounts.

     10.  Facebook users may join one or more groups or networks
to connect and interact with other users who are members of the
same group or network.  Facebook assigns a group identification
number to each group.  A Facebook user can also connect directly
with individual Facebook users by sending each user a "Friend
Request," records of which requests Facebook retains.  If the
recipient of a "Friend Request" accepts the request, then the
two users will become "Friends" for purposes of Facebook and can
exchange communications or view information about each other.
Each Facebook user's account includes a list of that user's
"Friends" and a "News Feed," which highlights information about
the user's "Friends," such as profile changes, upcoming events,
and birthdays.  Facebook also retains lists of users that have
been removed or deleted as "Friends."  A user can also indicate
that some "Friends" are family members, which Facebook stores as
"Family" data.  Facebook also retains lists of persons a user

"follows" as well as a list of those persons who "follow" the user.  Facebook also retains data regarding any friends, apps, or pages a user has "hidden" from their News Feed.

11.  Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

12.  Facebook users can create profiles in the "About" section of their timeline that include information about relationships, work, education, where the user lives currently, their "hometown," and personal interests, as well as photographs and other information, including "Favorite Quotes."  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at

11

particular dates and times.  Facebook also retains data for
locations associated with updates to a user's account (called
"last location").  A particular user's profile page also
includes a "Wall," which is a space where the user and his or
her "Friends" can post messages, attachments, and links that
will typically be visible to anyone who can view the user's
profile.

13.  Facebook allows users to upload photos and videos,
which may include metadata (such as EXIF data ) that can
indicate, for example, the user's location when s/he captured or
uploaded the photo or video, and the date and time the image was
captured or uploaded.  It also provides users the ability to
"tag" (i.e., label) other Facebook users in a photo or video.
When a user is tagged in a photo or video, he or she receives a
notification of the tag and a link to see the photo or video.
For Facebook's purposes, the photos and videos associated with a
user's account will include all photos and videos uploaded by
that user that have not been deleted, as well as all photos and
videos uploaded by any user that have that user tagged in them.

14.  Facebook users can exchange private messages on
Facebook with other users.  These messages, which are similar to
e-mail messages, are sent to the recipient's "Inbox" on
Facebook, which also stores copies of messages sent by the
recipient, as well as other information.  Facebook users can
also post comments on the Facebook profiles of other users or on
their own profiles; such comments are typically associated with
a specific posting or item on the profile.  Facebook stores

posts to a user's own page, as well as posts by a user to other
peoples' pages and posts by others to the user's page.  In
addition, Facebook has a feature that allows users to send and
receive instant messages or "chats" through Facebook.  These
communications are stored in the history of communications for
the account.  Facebook also has a Video Calling feature, and
although Facebook does not record the calls themselves, it does
keep records of the date of each call.  Facebook users can also
send files in various other formats as attachments to private
messages.  For example, a user can send another Facebook account
a compressed archive file in the format .zip as an attachment to
a message.

15.  If a Facebook user does not want to interact with
another user on Facebook, the first user can "block" the second
user from seeing his or her account.

16.  Facebook has a "like" feature that allows users to
give positive feedback or connect to particular pages.  Facebook
users can "like" Facebook posts or updates, as well as webpages
or content on third-party (i.e., non-Facebook) websites.
Facebook retains information on posts, photos, or content a user
has "liked," as well as "likes" about a user's own posts,
photos, or other content; Facebook also retains data regarding
"likes" a user has made on sites off of Facebook.  Facebook
users can also become "fans" of particular Facebook pages.

17.  Facebook has a search function that enables its users
to search Facebook for keywords, usernames, or pages, among
other things.

18.   Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.   The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.   The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

19.   Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

20.   The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.   Gifts cost money to purchase, and a personalized message can be attached to each gift.   Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.   Lists of who has "poked" a user and who has been "poked" by a user are retained by Facebook, except for "poke" content from the mobile app, which is available for only a brief period of time.

21.   Facebook also has a Marketplace feature, which allows users to post free classified ads.   Users can post items for sale, housing, jobs, and other items on the Marketplace.

22.   In addition to the applications described above, Facebook also provides its users with access to thousands of

14

other applications ("apps") on the Facebook platform.  When a
Facebook user accesses or uses one of these applications, an
update about that the user's access or use of that application
may appear on the user's profile page.  Facebook also retains
lists of all of the apps a user has added.

23.  Some Facebook pages are affiliated with groups of
users, rather than one individual user.  Membership in the group
is monitored and regulated by the administrator or head of the
group, who can invite new members and reject or accept requests
by users to enter.  Facebook can identify all users who are
currently registered to a particular group and can identify the
administrator and/or creator of the group.  Facebook uses the
term "Group Contact Info" to describe the contact information
for the group's creator and/or administrator, as well as a PDF
of the current status of the group profile page.

24.  Facebook uses the term "Neoprint" to describe an
expanded view of a given user profile.  The "Neoprint" for a
given user can include the following information from the user's
profile:  profile contact information; News Feed information;
status updates; links to videos, photographs, articles, and
other items; Notes; Wall postings; friend lists, including the
friends' Facebook user identification numbers; groups and
networks of which the user is a member, including the groups'
Facebook group identification numbers; future and past event
postings; rejected "Friend" requests; comments; gifts; pokes;
tags; and information about the user's access and use of
Facebook applications.

25.   Facebook also stores information relating to each
active session by a user, including date, time, device, Internet
Protocol ("IP") address, machine cookie, and browser
information.  These session logs may contain information about
the actions taken by the user ID or IP address on Facebook,
including information about the type of action, the date and
time of the action, and the machine ID, user ID, and IP address
associated with the action.  For example, if a user views a
Facebook profile, that user's IP log would reflect the fact that
the user viewed the profile, and would show when and from what
IP address, browser, and device ID the user did so.

26.  Social networking providers like Facebook typically
retain additional information about their users' accounts, such
as information about the length of service (including activation
date and deactivation, disabling, or deletion dates, if
applicable), the types of service utilized, and the means and
source of any payments associated with the service (including
any credit card or bank account number).  In some cases,
Facebook users may communicate directly with Facebook about
issues relating to their accounts, such as technical problems,
billing inquiries, or complaints from other users.  Social
networking providers like Facebook typically retain records
about such communications, including records of contacts between
the user and the provider's support services, as well as records
of any actions taken by the provider or user as a result of the
communications.

## IV. BACKGROUND ON THE SEIZURE OF DIGITAL EVIDENCE FROM THE PROVIDER

27.   I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account.  Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was.  Often those pieces will come from a time period before the account was used in the criminal activity.  Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account.  Therefore, the contents of a given account, including the email addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account.  For the purpose of searching for content demonstrating the actual user(s) of a SUBJECT ACCOUNT, I am requesting a

warrant requiring the PROVIDER to turn over all information
associated with a SUBJECT ACCOUNT with the date restriction
included in Attachment B for review by the search team.

28.   Relatedly, the government must be allowed to determine
whether other individuals had access to a SUBJECT ACCOUNT.   If
the government were constrained to review only a small
subsection of an account, that small subsection might give the
misleading impression that only a single user had access to the
account.

29.   I also know based on my training and experience that
criminals discussing their criminal activity may use slang,
short forms (abbreviated words or phrases such as "lol" to
express "laugh out loud"), or codewords (which require entire
strings or series of conversations to determine their true
meaning) when discussing their crimes.   They can also discuss
aspects of the crime without specifically mentioning the crime
involved.   In the electronic world, it is even possible to use
pictures, images and emoticons (images used to express a concept
or idea such as a happy face inserted into the content of a
message or the manipulation and combination of keys on the
computer keyboard to convey an idea, such as the use of a colon
and parenthesis :) to convey a smile or agreement) to discuss
matters.   "Keyword searches" would not account for any of these
possibilities, so actual review of the contents of an account by
law enforcement personnel with information regarding the
identified criminal activity, subject to the search procedures

set forth in Attachment B, is necessary to find all relevant evidence within the account.

30. This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

31. As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

    a.  I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

    b.  I also know from my training and experience that many accounts are purged as part of the ordinary course of

business by providers.  For example, if an account is not
accessed within a specified time period, it -- and its contents
-- may be deleted.  As a consequence, there is a risk that the
only record of the contents of an account might be the
production that a provider makes to the government, for example,
if a defendant is incarcerated and does not (perhaps cannot)
access his or her account.  Preserving evidence, therefore,
would ensure that the government can satisfy its Brady
obligations and give the defendant access to evidence that might
be used in his or her defense.

### V.  REQUEST FOR NON-DISCLOSURE

32.  Pursuant to 18 U.S.C. § 2705(b), I request that the
Court enter an order commanding the PROVIDER not to notify any
person, including the subscriber(s) of the SUBJECT ACCOUNT, of
the existence of the warrant until further order of the Court,
until written notice is provided by the United States Attorney's
Office that nondisclosure is no longer required, or until one
year from the date the requested warrant is signed by the
magistrate judge, or such later date as may be set by the Court
upon application for an extension by the United States.  There
is reason to believe that such notification will result in
(1) endangering the life or physical safety of an individual;
(2) flight from prosecution; (3) destruction of or tampering
with evidence; (4) intimidation of potential witnesses; and
(5) otherwise seriously jeopardizing the investigation.

## VI. <u>CONCLUSION</u>

33.  Based on the foregoing, I request that the Court issue the requested warrant.  The government will execute this warrant by serving the warrant on the PROVIDER.  Because the warrant will be served on the PROVIDER, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Attested to by the applicant in accordance with the requirements of <u>Fed. R. Crim. P. 4.1</u> by telephone on this <u>7th</u> day of April, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

March 16, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____IM_____ DEPUTY

In the Matter of the Search of:
Information associated with account identified as
facebook.com/profile.php?id=100025447988634 that
is within the possession, custody, or control of
Facebook Inc.

)
)
)
)
)

Case No. 21-MJ-01298

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☒ Evidence of a crime;
☒ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1962(d) | Racketeer Influenced and Corrupt Organization ("RICO") Conspiracy |
| 21 U.S.C. § 846 | Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

*Applicant's signature*

Merrilee Goodwin, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: March 16, 2021

City and State: Los Angeles, CA

*Judge's signature*

Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

     This warrant applies to information associated with the SUBJECT ACCOUNT identified as facebook.com/profile.php?id=100025447988634 that is within the possession, custody, or control of Facebook Inc., a company that accepts service of legal process at 1601 Willow Road, Menlo Park, CA 94025, regardless of where such information is stored, held, or maintained.

## ATTACHMENT B

### ITEMS TO BE SEIZED

I. **SEARCH PROCEDURES**

1.   The warrant will be presented to personnel of Facebook Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.   To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.   The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.   With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.  The review of the electronic data may

be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.  The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant. The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.  Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court. Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.  INFORMATION TO BE DISCLOSED BY THE PROVIDER

10.    To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.    All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred between July 1, 2020 and the date of this warrant,[4] including:

i.    All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account,

---

[4] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

draft messages, deleted messages, and messages maintained in
trash or any other folders or tags or labels, as well as all
header information associated with each email or message
(including the actual IP addresses of the sender and recipients
of the emails), and any related documents or attachments.

    ii. All records or other information stored by
subscriber(s) of the SUBJECT ACCOUNT, including address books,
contact and buddy lists, calendar data, pictures, videos, notes,
texts, links, user profiles, account settings, access logs, and
files.

    iii. All records pertaining to communications
between the PROVIDER and any person regarding the SUBJECT
ACCOUNT, including contacts with support services and records of
actions taken.

   b. All other records and information, including:

    i. All subscriber information, including the
date on which the account was created, the length of service,
the IP address used to register the account, the subscriber's
full name(s), screen name(s), any alternate names, other account
names or email addresses associated with the account, linked
accounts, telephone numbers, physical addresses, and other
identifying information regarding the subscriber, including any
removed or changed names, email addresses, telephone numbers or
physical addresses, the types of service utilized, account
status, account settings, login IP addresses associated with
session dates and times, as well as means and source of payment,
including detailed billing records, **and including any changes**

**made to any subscriber information** or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

(I) the SUBJECT ACCOUNT.

ii. All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

**III. INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11. For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a. All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1962(d) (Racketeer Influenced and Corrupt Organization ("RICO") Conspiracy); and 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute and Distribute Controlled Substances) (the "SUBJECT OFFENSES"), namely:

i. Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.  Information related to how and when the SUBJECT ACCOUNT was accessed or used;

iii. Information relating to the purchase, sale, distribution, possession and/or procurement of controlled substances, and the advertisement of controlled substances for sale;

iv.  Information relating to the proceeds of the sale or distribution of controlled substances;

v.   Information relating to the extortion activities of racially motivated violent extremist organizations, including the San Fernando Valley Peckerwoods and the Aryan Brotherhood and their methods of extorting drug traffickers, including through the use of weapons; and

vi.  Information relating to co-conspirators engaged in the SUBJECT OFFENSES, which could include information relating to their identities, whereabouts, communications, and methods of contact and communication.

b.   All records and information described above in Section II.10.b.

## IV.  PROVIDER PROCEDURES

12.  IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

FBI Special Agent Merrilee Goodwin
(310) 420-5091
MRGOODWIN@fbi.gov

13.  IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States.  Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDER shall notify the agent identified in paragraph 12 above of its intent to so notify.

**AFFIDAVIT**

I, Merrilee Goodwin, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI").  I have been a Special Agent with the FBI since 1998.  I am currently assigned to a Domestic Terrorism Squad of the Los Angeles Field Office, where I primarily investigate people who commit violent criminal acts in furtherance of their political or social ideology, and investigate threats associated with the nefarious use of chemical, biological, radiological, nuclear, and explosive materials.  In this capacity, I investigate federal crimes as it pertains to terrorism, and have gained experience in cyber-based matters including those involving dark web markets.  As a result, I am familiar with the methods used by criminals in furtherance of their criminal activities in both the virtual and physical worlds, and I have received both formal and informal training from the FBI and other institutions regarding cyber and computer crime investigations and review of digital devices.  As a Special Agent, I completed the FBI Academy in Quantico, Virginia, and received training to include the fundamentals of law, ethics, interviewing, report writing, firearms, surveillance, defensive tactics, and case management.  I have also received training regarding the methods of operations of individuals who distribute drugs.

2.   I make this affidavit in support of an application for
a warrant for information associated with the account identified
as facebook.com/profile.php?id=100025447988634 (the "SUBJECT
ACCOUNT") that is stored at premises controlled by Facebook Inc.
(the "PROVIDER"), a provider of electronic communication and
remote computing services, headquartered at 1601 Willow Road,
Menlo Park, CA 94025.[1]  The information to be searched is
described in Attachment A.  This affidavit is made in support of
an application for a warrant under 18 U.S.C. §§ 2703(a),
2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER

---

[1] Because this Court has jurisdiction over the offense(s)
being investigated, it may issue the warrant to compel the
PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A).
See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the
disclosure by a provider . . . pursuant to a warrant issued
using the procedures described in the Federal Rules of Criminal
Procedure . . . by a court of competent jurisdiction") and 2711
("the term 'court of competent jurisdiction' includes -- (A) any
district court of the United States (including a magistrate
judge of such a court) or any United States court of appeals
that -- (i) has jurisdiction over the offense being
investigated; (ii) is in or for a district in which the provider
of a wire or electronic communication service is located or in
which the wire or electronic communications, records, or other
information are stored; or (iii) is acting on a request for
foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to
18 U.S.C. § 2703(d).  To obtain the basic subscriber
information, which does not contain content, the government
needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To
obtain additional records and other information--but not
content--pertaining to subscribers of an electronic
communications service or remote computing service, the
government must comply with the dictates of section
2703(c)(1)(B), which requires the government to supply specific
and articulable facts showing that there are reasonable grounds
to believe that the records or other information sought are
relevant and material to an ongoing criminal investigation in
order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The
requested warrant calls for both records containing content (see
Attachment B paragraph II.10.a.) as well as subscriber records
                                   *(footnote cont'd on next page)*

2

to disclose to the government copies of the information
(including the content of communications) described in Section
II of Attachment B.  Upon receipt of the information described
in Section II of Attachment B, law enforcement agents and/or
individuals assisting law enforcement and acting at their
direction will review that information to locate the items
described in Section III of Attachment B.  Attachments A and B
are incorporated herein by reference.

3.    As described more fully below, I respectfully submit
there is probable cause to believe that the information
associated with the SUBJECT ACCOUNT constitutes evidence,
contraband, fruits, or instrumentalities of criminal violations
of 18 U.S.C. § 1962(d) (Racketeer Influenced and Corrupt
Organization ("RICO") Conspiracy); and 21 U.S.C. § 846
(Conspiracy to Possess with Intent to Distribute and Distribute
Controlled Substances).

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from other agents and witnesses.  This
affidavit is intended to show merely that there is sufficient
probable cause for the requested warrant and does not purport to
set forth all of my knowledge of or investigation into this
matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are

---

and other records and information that do not contain content
(see Attachment B paragraph II.10.b.).

related in substance and in part only, with typographical errors
in the original, and all dates and times are approximate.

## II. <u>LEGAL BACKGROUND</u>

    5.    Pursuant to <u>18 U.S.C. § 1962(c)</u>:

> <u>It</u> shall be unlawful for any person employed by or
> associated with any enterprise engaged in, or the
> activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or
> indirectly, in the conduct of such enterprise's
> affairs through a pattern of racketeering activity or
> collection of unlawful debt.

Additionally, "[i]t shall be unlawful for any person to conspire

to violate any of the provisions of subsection . . . (c) of this

section." <u>18 U.S.C. § 1962(d)</u>.

    6.    Racketeering activity means:

> any act or threat involving . . . extortion . . . or
> dealing in a controlled substance or listed chemical
> (as defined in section 102 of the Controlled
> Substances Act), which is chargeable under State law
> and punishable by imprisonment for more than one year
> [or] . . . the felonious manufacture, importation,
> receiving, concealment, buying, selling, or otherwise
> dealing in a controlled substance or listed chemical
> (as defined in section 102 of the Controlled
> Substances Act), punishable under any law of the
> United States.

<u>18 U.S.C. § 1961(1)</u>.

    7.    A pattern of racketeering activity

> requires at least two acts of racketeering activity,
> one of which occurred after the effective date of this
> chapter and the last of which occurred within ten
> years (excluding any period of imprisonment) after the
> commission of a prior act of racketeering activity.

<u>18 U.S.C. § 1961(5)</u>. An enterprise "includes any individual,

partnership, corporation, association, or other legal entity,

and any union or group of individuals associated in fact

although not a legal entity." <u>18 U.S.C. § 1961(4)</u>.

## III. <u>STATEMENT OF PROBABLE CAUSE</u>

A.    **Law Enforcement Seized Methamphetamine, Heroin, Fentanyl, and Xanax from Miller on August 11, 2020**

8.    On January 8, 2021, the Honorable Pedro V. Castillo, United States Magistrate Judge, issued a warrant in Case Number 21-MJ-00104 (C.D. Cal.), authorizing the search of facebook.com/profile.php?id=100049040117875, which is a Facebook Account belonging to Ian Eric Miller ("Miller"), to search for evidence, contraband, fruits, or instrumentalities of criminal violations of <u>21 U.S.C. § 841(a)(1):</u> Possession with Intent to Distribute Controlled Substances.  The signed application for a warrant and affidavit are attached hereto as Exhibit 1, and are incorporated by reference.

9.    As described in the search warrant affidavit, on August 11, 2020, Miller, who was in a vehicle in Simi Valley, California, was arrested by Ventura County Sheriff's Office ("VCSO") Deputies for a violation of California Health and Safety Code 15550(a)(1): Under the Influence of a Controlled Substance.  During the search of Miller's vehicle, law enforcement officers located, among other items, approximately 2,128.4 grams of actual methamphetamine, approximately 200.21 grams of a mixture or substance containing a detectable amount of heroin, approximately 190.7 grams of fentanyl, a loaded Glock 9mm handgun without a serial number, $1,565 dollars in U.S. currency, and a working digital scale.

10.    Based on my review of a law enforcement report prepared by VCSO Deputy Sheriff Joseph Horswill, I am also aware

5

that deputies located approximately 2,430 suspected Alprazolam ("Xanax") tablets in Miller's vehicle on the same date.

11.  As a result of his conduct on August 11, 2020, Miller has been charged in an information in <u>United States v. Miller</u>, CR No. 21-00071-PA with <u>21 U.S.C. § 841(a)(1)</u>, <u>(b)(1)(A)</u>(viii), (b)(1)(B)(i), and (b)(1)(B)(vi): Possession with Intent to Distribute Methamphetamine, Heroin, and Fentanyl; and <u>18 U.S.C. § 922(g)(1)</u>: Felon in Possession of Ammunition.

**B.   The User of the SUBJECT ACCOUNT Instructs Miller to Pay "Taxes" in Connection with Miller's Drug Distribution Activities**

12.  Based on my training, experience, and knowledge of and participation in the investigation of Miller, my communications with local law enforcement officers who interact regularly with the San Fernando Valley Peckerwoods ("SFVPs"), as well as my own internet research with respect to the SFVPs, I am aware of the following:

a.   The SFVPs are a Racially Motivated Violent Extremist group that is based in Los Angeles County.  SFVPs' members have engaged criminal activity such as drug and illegal firearms trafficking.  I believe that SFVPs' members associate together to form a criminal enterprise and conspire with each other to engage in a pattern of racketeering activity to include drug trafficking.

b.   The Peckerwoods originated in the California State prison system.  Peckerwood groups are spread throughout the state of California.

c.    Peckerwoods are often required by their peers to earn their "bolts," which refers to the lightning bolt tattoos usually found on the inside portion of their left biceps.  To earn this tattoo, a Peckerwood generally must commit a serious assault against a non-white individual.

d.    Miller is believed to be a member of the SFVPs, and has a "SWP" tattoo on his back, which stands for Supreme White Power.  He is believed to be one of the SFVPs who regularly engages in drug trafficking.

13.    Based on my review of the contents of Miller's Facebook account pursuant to the warrant described above, I am aware of the following:

1.    October 24-25, 2020 Communication with the User of the SUBJECT ACCOUNT

a.    On October 24, 2020, the user of the SUBJECT ACCOUNT sent Miller a Facebook message that stated:

> Hey man. I just wanted to touch basis with you .. my best friend works with [T.W.] the big homeboy, he is [T.W.'s] guy out here.  collecting taxes for the white boys and in exchange obviously you will be protected and taken care of and they could definitely smooth over any issues you may have with the Mexicans..I just wanted to approach you on the situation so you could have a heads up and expect a call from [T.W.] through my boy.

b.    Based on my training, experience, and knowledge of the investigation, I am aware that many individuals who distribute drugs in Southern California must pay a portion of their drug proceeds to the gang or organized crime group that operates as a criminal enterprise in order to control the "territory" and to extort the individuals who are distributing

those drugs.  These payments are often referred to as "taxes."
In exchange for these "tax" payments, drug distributors, like
Miller, obtain authorization from the members and associates of
the criminal enterprise to sell drugs in a particular geographic
area, and also receive protection from the members and
associates of the criminal enterprise who extort the "tax"
payments so that other individuals do not steal their drugs and
drug proceeds, or otherwise interfere with their drug
trafficking activities.  Additionally, based on my training and
experience, I am aware that individuals who extort these "tax"
payments often make threats of violence and possess weapons in
order to increase their authority over drug distributors, like
Miller, who do business in their "territory."

        c.    Based on my training, experience, and knowledge
of the investigation, I believe that the user of the SUBJECT
ACCOUNT associates with "white boys" who collect "taxes,"
meaning a white supremacist group, possibly the Aryan
Brotherhood,[3] that operates as a criminal enterprise and whose
members and associates conspire to control a particular
"territory" where drugs are distributed, and engage in a pattern
of racketeering activity that includes extortion.  I believe
that T.W., who is referred to as the "big homeboy" is one of the
leaders of that criminal enterprise.  I further believe that the
user of the SUBJECT ACCOUNT communicated instructions to Miller
in order to assist T.W. and other members and associates of the

---

       [3] Based on the name that the user of the SUBJECT ACCOUNT
gave for T.W., I believe that T.W. is a member of the Aryan
Brotherhood who is currently incarcerated.

criminal enterprise extort drug distribution proceeds from Miller.  Finally, I believe that the user of the SUBJECT ACCOUNT informed Miller that, in exchange for these "tax" payments, Miller would receive protection from members and associates of T.W.'s criminal enterprise against "Mexicans," that is, members of gangs that are aligned with the Mexican Mafia.

> d.   On October 24, 2020, shortly after he received this message, Miller placed a Facebook call to the user of the SUBJECT ACCOUNT.  Based on my training, experience, and knowledge of the investigation, I believe Miller and the user of the SUBJECT ACCOUNT further discussed Miller's drug distribution activities and "tax" payments during this call.

> e.   On October 25, 2020, the user of the SUBJECT ACCOUNT sent a Facebook message to Miller that stated:  "I told boogy what you said man and he's going to back off just wanted to let you know."  In response, Miller sent the user of the SUBJECT ACCOUNT a thumbs up emoji.  The user of the SUBJECT ACCOUNT then sent Miller a thumbs up emoji.  Based on my training, experience, and knowledge of the investigation, I believe that "boogy" is an associate of T.W.'s criminal enterprise, and assists T.W. extort drug distribution proceeds on behalf of T.W.'s criminal enterprise.  When the user of the SUBJECT ACCOUNT told Miller that boogy was going to "back off," I believe that boogy was going to be more lenient with respect to personally collecting "taxes" from Miller in connection with Miller's drug distribution activity.

2.  October 29, 2020 Communication with the SUBJECT ACCOUNT

a.  On October 29, 2020, the user of the SUBJECT ACCOUNT and Miller sent the following Facebook messages to each other:

i.  User of the SUBJECT ACCOUNT: "Look man I told you this situation because I respected you.  And now I'm hearing your telling everyone that I said that [T.W.] said you didn't have to pay anything I never said that."

ii. Miller: "Only Tiny.  Because I told him from start he should not."

iii. User of the SUBJECT ACCOUNT: "Yeah but I never told you [T.W.] said you didn't have to pay [taxes][.]  I told you boogy wasn't going to come looking for you."

iv.  Miller: "Before I heard any response."  "Ok thanks for clarifying.  I also told Tiny, between Mexico and our own people and my liver my experation date May be sooner than expected."

v.  User of the SUBJECT ACCOUNT: "Rip.  Lhaha im [just kidding] man.  You'll be alright."

vi.  Miller: "I'm not concerned whatever the outcome."

b.  Based on my training, experience, and knowledge of the investigation, I believe that, on this date, the user of the SUBJECT ACCOUNT provided Miller with additional instructions regarding his obligation to pay "taxes" to members of T.W.'s criminal enterprise in connection with Miller's drug

distribution activities.  I believe that the user of the SUBJECT ACCOUNT informed Miller that he still needed to pay "taxes" to T.W.'s criminal enterprise, but that an individual who goes by the name of "boogy" was not going to personally collect those "taxes" from Miller.

        c.    Additionally, I believe that Miller told the user of the SUBJECT ACCOUNT that, between his interactions with members of white supremacist organizations, members of gangs aligned with the Mexican Mafia, and his own health issues, Miller did not expect to live long.

        3.    <u>December 13, 2020 Communication with the SUBJECT ACCOUNT</u>

        a.    On December 13, 2020, the user of the SUBJECT ACCOUNT sent Miller a Facebook message that stated:  "Hey can you get bars?"  Based on my training, experience, and knowledge of the investigation, when the user of the SUBJECT ACCOUNT says "bars," I believe he or she is referring to Xanax bars or tablets, such as the ones seized from Miller on August 11, 2020. I know that "Xanax bars" is street slang for recreational Xanax.

        b.    Based on my training, experience, and knowledge of the investigation, I believe that, on this date, the user the SUBJECT ACCOUNT discussed with Miller his drug distribution activities, and asked Miller if he presently had Xanax bars available to distribute.

### IV. BACKGROUND ON SOCIAL MEDIA ACCOUNTS AND THE PROVIDER

    14.  Based on a review of information provided by Facebook regarding its services and data retention policies, information

provided by other FBI Special Agents, and/or my training and
experience, I am aware of the information contained in this
section of the affidavit regarding Facebook.

15.  Facebook owns and operates a free-access social
networking website of the same name that can be accessed at
http://www.facebook.com.  Facebook allows its users to establish
accounts with Facebook, and users can then use their accounts to
share written news, photographs, videos, and other information
with other Facebook users, and sometimes with the general
public.

16.  Facebook asks users to provide basic contact and
personal identifying information to Facebook, either during the
registration process or thereafter.  This subscriber information
may include the user's full name, any alternate names such as a
maiden name or nickname, birth date, gender, contact e-mail
addresses (including deleted addresses), Facebook passwords,
Facebook security questions and answers (for password
retrieval), physical address (including city, state, and zip
code), telephone numbers, screen names, websites, and other
personal identifiers.  Facebook stores both current and prior
information, such as past addresses or names provided by a user.
Facebook also assigns a user identification number to each
account.  Facebook also allows users to "link" other accounts
(i.e., accounts maintained at other providers of e-mail or
social media services) to their Facebook accounts, and stores
information about these linked accounts.

17.   Facebook users may join one or more groups or networks
to connect and interact with other users who are members of the
same group or network.  Facebook assigns a group identification
number to each group.  A Facebook user can also connect directly
with individual Facebook users by sending each user a "Friend
Request," records of which requests Facebook retains.  If the
recipient of a "Friend Request" accepts the request, then the
two users will become "Friends" for purposes of Facebook and can
exchange communications or view information about each other.
Each Facebook user's account includes a list of that user's
"Friends" and a "News Feed," which highlights information about
the user's "Friends," such as profile changes, upcoming events,
and birthdays.  Facebook also retains lists of users that have
been removed or deleted as "Friends."  A user can also indicate
that some "Friends" are family members, which Facebook stores as
"Family" data.  Facebook also retains lists of persons a user
"follows" as well as a list of those persons who "follow" the
user.  Facebook also retains data regarding any friends, apps,
or pages a user has "hidden" from their News Feed.

18.   Facebook users can select different levels of privacy
for the communications and information associated with their
Facebook accounts.  By adjusting these privacy settings, a
Facebook user can make information available only to himself or
herself, to particular Facebook users, or to anyone with access
to the Internet, including people who are not Facebook users.  A
Facebook user can also create "lists" of Facebook friends to
facilitate the application of these privacy settings.  Facebook

13

accounts also include other account settings that users can
adjust to control, for example, the types of notifications they
receive from Facebook.

19.  Facebook users can create profiles in the "About"
section of their timeline that include information about
relationships, work, education, where the user lives currently,
their "hometown," and personal interests, as well as photographs
and other information, including "Favorite Quotes."  Facebook
users can also post "status" updates about their whereabouts and
actions, as well as links to videos, photographs, articles, and
other items available elsewhere on the Internet.  Facebook users
can also post information about upcoming "events," such as
social occasions, by listing the event's time, location, host,
and guest list.  In addition, Facebook users can "check in" to
particular locations or add their geographic locations to their
Facebook posts, thereby revealing their geographic locations at
particular dates and times.  Facebook also retains data for
locations associated with updates to a user's account (called
"last location").  A particular user's profile page also
includes a "Wall," which is a space where the user and his or
her "Friends" can post messages, attachments, and links that
will typically be visible to anyone who can view the user's
profile.

20.  Facebook allows users to upload photos and videos,
which may include metadata (such as EXIF data ) that can
indicate, for example, the user's location when s/he captured or
uploaded the photo or video, and the date and time the image was

captured or uploaded.  It also provides users the ability to

"tag" (i.e., label) other Facebook users in a photo or video.

When a user is tagged in a photo or video, he or she receives a

notification of the tag and a link to see the photo or video.

For Facebook's purposes, the photos and videos associated with a

user's account will include all photos and videos uploaded by

that user that have not been deleted, as well as all photos and

videos uploaded by any user that have that user tagged in them.

    21.  Facebook users can exchange private messages on

Facebook with other users.  These messages, which are similar to

e-mail messages, are sent to the recipient's "Inbox" on

Facebook, which also stores copies of messages sent by the

recipient, as well as other information.  Facebook users can

also post comments on the Facebook profiles of other users or on

their own profiles; such comments are typically associated with

a specific posting or item on the profile.  Facebook stores

posts to a user's own page, as well as posts by a user to other

peoples' pages and posts by others to the user's page.  In

addition, Facebook has a feature that allows users to send and

receive instant messages or "chats" through Facebook.  These

communications are stored in the history of communications for

the account.  Facebook also has a Video Calling feature, and

although Facebook does not record the calls themselves, it does

keep records of the date of each call.  Facebook users can also

send files in various other formats as attachments to private

messages.  For example, a user can send another Facebook account

a compressed archive file in the format .zip as an attachment to
a message.

22.  If a Facebook user does not want to interact with
another user on Facebook, the first user can "block" the second
user from seeing his or her account.

23.  Facebook has a "like" feature that allows users to
give positive feedback or connect to particular pages.  Facebook
users can "like" Facebook posts or updates, as well as webpages
or content on third-party (i.e., non-Facebook) websites.
Facebook retains information on posts, photos, or content a user
has "liked," as well as "likes" about a user's own posts,
photos, or other content; Facebook also retains data regarding
"likes" a user has made on sites off of Facebook.  Facebook
users can also become "fans" of particular Facebook pages.

24.  Facebook has a search function that enables its users
to search Facebook for keywords, usernames, or pages, among
other things.

25.  Each Facebook account has an activity log, which is a
list of the user's posts and other Facebook activities from the
inception of the account to the present.  The activity log
includes stories and photos that the user has been tagged in, as
well as connections made through the account, such as "liking" a
Facebook page or adding someone as a friend.  The activity log
is visible to the user but cannot be viewed by people who visit
the user's Facebook page.

26.  Facebook Notes is a blogging feature available to
Facebook users, and it enables users to write and post notes or

personal web logs ("blogs"), or to import their blogs from other
services, such as Xanga, LiveJournal, and Blogger.

27. The Facebook Gifts feature allows users to send
virtual "gifts" to their friends that appear as icons on the
recipient's profile page. Gifts cost money to purchase, and a
personalized message can be attached to each gift. Facebook
users can also send each other "pokes," which are free and
simply result in a notification to the recipient that he or she
has been "poked" by the sender. Lists of who has "poked" a user
and who has been "poked" by a user are retained by Facebook,
except for "poke" content from the mobile app, which is
available for only a brief period of time.

28. Facebook also has a Marketplace feature, which allows
users to post free classified ads. Users can post items for
sale, housing, jobs, and other items on the Marketplace.

29. In addition to the applications described above,
Facebook also provides its users with access to thousands of
other applications ("apps") on the Facebook platform. When a
Facebook user accesses or uses one of these applications, an
update about that the user's access or use of that application
may appear on the user's profile page. Facebook also retains
lists of all of the apps a user has added.

30. Some Facebook pages are affiliated with groups of
users, rather than one individual user. Membership in the group
is monitored and regulated by the administrator or head of the
group, who can invite new members and reject or accept requests
by users to enter. Facebook can identify all users who are

currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

31. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

32. Facebook also stores information relating to each active session by a user, including date, time, device, Internet Protocol ("IP") address, machine cookie, and browser information. These session logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the machine ID, user ID, and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that

the user viewed the profile, and would show when and from what IP address, browser, and device ID the user did so.

33.  Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including activation date and deactivation, disabling, or deletion dates, if applicable), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

## V.  BACKGROUND ON THE SEIZURE OF DIGITAL EVIDENCE FROM THE PROVIDER

27.  I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement

19

has eyewitness testimony about a defendant's use of an account,
investigators often have to rely on circumstantial evidence to
show that an individual was the actual user of a particular
account.  Only by piecing together information contained in the
contents of an account may an investigator establish who the
actual user of an account was.  Often those pieces will come
from a time period before the account was used in the criminal
activity.  Limiting the scope of the search would, in some
instances, prevent the government from identifying the true user
of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of
the account.  Therefore, the contents of a given account,
including the email addresses or account identifiers and
messages sent to that account, often provides important evidence
regarding the actual user's dominion and control of that
account.  For the purpose of searching for content demonstrating
the actual user(s) of a SUBJECT ACCOUNT, I am requesting a
warrant requiring the PROVIDER to turn over all information
associated with a SUBJECT ACCOUNT with the date restriction
included in Attachment B for review by the search team.

        28.  Relatedly, the government must be allowed to determine
whether other individuals had access to a SUBJECT ACCOUNT.  If
the government were constrained to review only a small
subsection of an account, that small subsection might give the
misleading impression that only a single user had access to the
account.

29.    I also know based on my training and experience that
criminals discussing their criminal activity may use slang,
short forms (abbreviated words or phrases such as "lol" to
express "laugh out loud"), or codewords (which require entire
strings or series of conversations to determine their true
meaning) when discussing their crimes.  They can also discuss
aspects of the crime without specifically mentioning the crime
involved.  In the electronic world, it is even possible to use
pictures, images and emoticons (images used to express a concept
or idea such as a happy face inserted into the content of a
message or the manipulation and combination of keys on the
computer keyboard to convey an idea, such as the use of a colon
and parenthesis :) to convey a smile or agreement) to discuss
matters.  "Keyword searches" would not account for any of these
possibilities, so actual review of the contents of an account by
law enforcement personnel with information regarding the
identified criminal activity, subject to the search procedures
set forth in Attachment B, is necessary to find all relevant
evidence within the account.

30.    This application seeks a warrant to search all
responsive records and information under the control of the
PROVIDER, which is subject to the jurisdiction of this court,
regardless of where the PROVIDER has chosen to store such
information.

31.    As set forth in Attachment B, I am requesting a
warrant that permits the search team to keep the original
production from the PROVIDER, under seal, until the

investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

        a.   I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine. Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case. If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

        b.   I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers. For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted. As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account. Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## VI. <u>REQUEST FOR NON-DISCLOSURE</u>

32.  Pursuant to <u>18 U.S.C. § 2705(b)</u>, I request that the
Court enter an order commanding the PROVIDER not to notify any
person, including the subscriber(s) of the SUBJECT ACCOUNT, of
the existence of the warrant until further order of the Court,
until written notice is provided by the United States Attorney's
Office that nondisclosure is no longer required, or until one
year from the date the requested warrant is signed by the
magistrate judge, or such later date as may be set by the Court
upon application for an extension by the United States.  There
is reason to believe that such notification will result in
(1) endangering the life or physical safety of an individual;
(2) flight from prosecution; (3) destruction of or tampering
with evidence; (4) intimidation of potential witnesses; and
(5) otherwise seriously jeopardizing the investigation.

## VII. <u>CONCLUSION</u>

33.  Based on the foregoing, I request that the Court issue
the requested warrant.  The government will execute this warrant
by serving the warrant on the PROVIDER.  Because the warrant
will be served on the PROVIDER, which will then compile the

//

//

//

//

//

//

//

requested records at a time convenient to it, reasonable cause
exists to permit the execution of the requested warrant at any
time in the day or night.

Attested to by the applicant in
accordance with the requirements
of <u>Fed. R. Crim. P. 4.1</u> by
telephone on this 16th day of
March, 2021.

_Patricia Donahue_

UNITED STATES MAGISTRATE JUDGE

**EXHIBIT 1**

# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |  |
|---|---|---|
| In the Matter of the Search of:<br>Information associated with account identified as<br>facebook.com/profile.php?id=100049040117875 that<br>is within the possession, custody, or control of<br>Facebook Inc. | ) ) ) ) ) ) ) | Case No. AMENDED 21-MJ-00104 |

## APPLICATION FOR WARRANT PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code section(s) | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

/s/
_____
*Applicant's signature*

Merrilee Goodwin, FBI Special Agent
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____1/14/2021_____

City and State: ___Los Angeles, California___

_____
*Judge's signature*

Pedro V. Castillo, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Reema M. El-Amamy (x0552)

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

This warrant applies to information associated with the SUBJECT ACCOUNT identified as facebook.com/profile.php?id=100049040117875 that is within the possession, custody, or control of Facebook Inc., a company that accepts service of legal process at 1601 Willow Road, Menlo Park, CA 94025, regardless of where such information is stored, held, or maintained.

i

## ATTACHMENT B

## ITEMS TO BE SEIZED

**I.   SEARCH PROCEDURES**

1.    The warrant will be presented to personnel of Facebook Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.  The review of the electronic data may

be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found
in this warrant govern only the search of digital data pursuant
to the authority conferred by this warrant and do not apply to
any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an
agent is not required for service or execution of this warrant.

## II.   **INFORMATION TO BE DISCLOSED BY THE PROVIDER**

10.    To the extent that the information described in
Attachment A is within the possession, custody, or control of
the PROVIDER, regardless of whether such information is located
within or outside of the United States, including any
information that has been deleted but is still available to the
PROVIDER, or has been preserved pursuant to a request made under
18 U.S.C. § 2703(f), the PROVIDER is required to disclose the
following information to the government for each SUBJECT ACCOUNT
listed in Attachment A:

a.    All contents of all wire and electronic
communications associated with the SUBJECT ACCOUNT, limited to
that which occurred between August 1, 2020 and the date of this
warrant,[1] including:

i.    All e-mails, communications, or messages of
any kind associated with the SUBJECT ACCOUNT, including stored
or preserved copies of messages sent to and from the account,

---

[1] To the extent it is not reasonably feasible for the
PROVIDER to restrict any categories of records based on this
date restriction (for example, because a date filter is not
available for such data), the PROVIDER shall disclose those
records in its possession at the time the warrant is served upon
it.

deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments.

      ii.  All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

      iii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

      iv.  All photos and videos uploaded by that user ID, all photos and videos uploaded by any user that have that user tagged in them, and all photos and videos "liked" or commented on by the user, as well as any metadata associated therewith, including, specifically, EXIF data;

      v.   All profile information, "About Me" information, and Neoprint information, including the user's website; News Feed information, including any information hidden from News Feed; status updates and "recent activities"; links to videos, photographs, articles, and other items; Notes; Wall postings ("Posts by You," "Posts by Others," and "Posts to Others"); friend lists, including persons identified as "family," and including the friends' Facebook user identification numbers and any deleted or removed friends;

groups and networks of which the user is a member, including the groups' Facebook group identification numbers; lists of "followers" and "following" accounts; future and past event postings, invitations, and events sent to or joined by the user; "stories" by, tagged, or commented on by the user; places "liked" or visited by the user; "Friend" requests, including Friend requests sent to or from the SUBJECT ACCOUNT, and including Friend requests accepted or rejected; comments; gifts; pokes; tags, including both who has been tagged on the SUBJECT ACCOUNT's profile and when the user of the SUBJECT ACCOUNT has been tagged in other users' profiles; notifications and notification settings of any kind; information about the user's access and use of Facebook or third-party applications or "apps"; and any "shares" – i.e. content shared with other Facebook users;

        vi.  All other records of communications and messages of any kind made or received by the user, including all private or instant messages or "chats," and specifically including all attachments to any messages in their native formats (for example, if a .zip file was sent to another user, the .zip file shall be provided), history of communications of any kind, video calling history, and pending "Friend" requests;

        vii. All "Active Sessions" information and activity logs for the account and all other documents showing the user's posts and other Facebook activities;

        viii.   All search history and web history for the user of the SUBJECT ACCOUNT, including records of Facebook

searches and internet/web searches, and including web browsing
that might occur outside of Facebook, but that Facebook is able
to connect to the SUBJECT ACCOUNT when the SUBJECT ACCOUNT
visits websites that are using Facebook's webpage "like"
functionality;

        ix.  All records of the account's usage of the
"Like" feature, including all Facebook posts and all non-
Facebook webpages and content that the user has "liked" ("Likes
on Others' Posts," "Likes on Your Posts from Others," and "Likes
on Other Sites"), as well as all information about the Facebook
pages of which the account is or was a "fan" and any information
in the account's connections;

        x.  All records of Facebook Notes or use of
Facebook's web logging or "blogging" features, including
importing of blogs from other services.

      b.  All other records and information, including:

        i.  All subscriber information, including the
date on which the account was created, the length of service,
the IP address used to register the account, the subscriber's
full name(s), screen name(s), any alternate names, other account
names or e-mail addresses associated with the account, linked
accounts, telephone numbers, physical addresses, and other
identifying information regarding the subscriber, including any
removed or changed names, email addresses, telephone numbers or
physical addresses, the types of service utilized, account
status, account settings, login IP addresses associated with
session dates and times, as well as means and source of payment,

including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

(I)  the SUBJECT ACCOUNT.

ii.  All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

iii. All "check ins," "last location," and other location information;

iv.  All past and present lists of friends created or accepted by the account;

v.   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, privacy settings that apply to certain lists of Facebook friends and the accompanying lists, and all records showing which Facebook users have been blocked by the account;

vi.  All information about the user's access and use of Facebook Marketplace;

vii. All information about connections between the account and third-party websites and applications;

viii. All information related to the SUBJECT ACCOUNT's membership in any groups, including the identity of other accounts in the same group, and information identifying any groups or organizational pages or accounts for which the SUBJECT ACCOUNT is an administrator.

## III. INFORMATION TO BE SEIZED BY THE GOVERNMENT

11. For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a. All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1), namely:

i. Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii. Information regarding drug suppliers, drug customers, the location where drugs are stored, the proceeds generated from the sale of drugs, and the methods by which drugs are distributed;

b. All records and information described above in Section II.10.b.

## IV. PROVIDER PROCEDURES

12. IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the

ix

service of this warrant.  The PROVIDER shall send such
information to:

        FBI Special Agent Merrilee Goodwin

        MRGOODWIN@fbi.gov

    13.  IT IS FURTHER ORDERED that the PROVIDER shall provide
the name and contact information for all employees who conduct
the search and produce the records responsive to this warrant.

    14.  IT IS FURTHER ORDERED, pursuant to 18 U.S.C.
§ 2705(b), that the PROVIDER shall not notify any person,
including the subscriber(s) of each account identified in
Attachment A, of the existence of the warrant, until further
order of the Court, until written notice is provided by the
United States Attorney's Office that nondisclosure is no longer
required, or until one year from the date this warrant is signed
by the magistrate judge or such later date as may be set by the
Court upon application for an extension by the United States.
Upon expiration of this order, at least ten business days prior
to disclosing the existence of the warrant, the PROVIDER shall
notify the agent identified in paragraph 12 above of its intent
to so notify

**AFFIDAVIT**

I, Merrilee Goodwin, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been a Special Agent with the FBI since 1998. I am currently assigned to a Domestic Terrorism Squad of the Los Angeles Field Office, where I primarily investigate people who commit violent criminal acts in furtherance of their political or social ideology, and investigate threats associated with the nefarious use of chemical, biological, radiological, nuclear, and explosive materials. In this capacity, I investigate federal crimes as it pertains to terrorism, and have gained experience in cyber-based matters including those involving dark web markets. As a result, I am familiar with the methods used by criminals in furtherance of their criminal activities in both the virtual and physical worlds, and I have received both formal and informal training from the FBI and other institutions regarding cyber and computer crime investigations and review of digital devices. As a Special Agent, I completed the FBI Academy in Quantico, Virginia, and received training to include the fundamentals of law, ethics, interviewing, report writing, firearms, surveillance, defensive tactics, and case management. I have also received training regarding the methods of operations of individuals who distribute drugs.

2.   I make this affidavit in support of an application for a warrant for information associated with the account identified as facebook.com/profile.php?id=100049040117875 (the "SUBJECT ACCOUNT") that is stored at premises controlled by Facebook Inc. (the "PROVIDER"), a provider of electronic communication and remote computing services, headquartered at 1601 Willow Road, Menlo Park, CA 94025.[1]  The information to be searched is described in Attachment A.  This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records
*(footnote cont'd on next page)*

2

to disclose to the government copies of the information
(including the content of communications) described in Section
II of Attachment B.  Upon receipt of the information described
in Section II of Attachment B, law enforcement agents and/or
individuals assisting law enforcement and acting at their
direction will review that information to locate the items
described in Section III of Attachment B.  Attachments A and B
are incorporated herein by reference.

3.    As described more fully below, I respectfully submit
there is probable cause to believe that the information
associated with the SUBJECT ACCOUNT constitutes evidence,
contraband, fruits, or instrumentalities of criminal violations
of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute
Controlled Substances.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from other agents and witnesses.  This
affidavit is intended to show merely that there is sufficient
probable cause for the requested warrant and does not purport to
set forth all of my knowledge of or investigation into this
matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

---

and other records and information that do not contain content
(see Attachment B paragraph II.10.b.).

## II. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    Law Enforcement Seized Methamphetamine, Heroin, and Fentanyl from MILLER on August 11, 2020**

5.    Based on my review of a law enforcement report prepared by Ventura County Sheriff's Office ("VCSO") Deputy Sheriff Joseph Horswill, I am aware of the following:

a.    In August 2020, Deputy Sheriff Horswill received information from a confidential human source ("CHS #1")[3] that MILLER had been released from prison in May of 2020, and was selling drugs in Simi Valley, California.  Additionally, CHS #1 informed Deputy Sheriff Horswill that MILLER was transient, and therefore sold drugs from his vehicle, which was a gray four door sedan.  According to CHS #1, during the weekend of August 8, 2020, s/he had observed a few pounds of methamphetamine in MILLER's vehicle.

b.    On August 11, 2020, CHS #1 informed Deputy Sheriff Horswill that MILLER's vehicle was currently in Simi Valley, California, near Sequoia Avenue and Los Angeles Avenue. After learning of the location of MILLER's vehicle, at approximately 4:15 p.m., Deputy Sheriff Horswill observed MILLER standing near a gray Chevrolet Malibu in front of a residence located on Crater Road in Simi Valley.  He watched MILLER walk away from the vehicle and enter the residence.  At approximately

---

[3] Based on my knowledge of the investigation and my conversations with Deputy Sheriff Horswill, I am aware that CHS #1 has cooperated with law enforcement officers with the VCSO since approximately June of 2020.  CHS #1 has a criminal history that includes state narcotics convictions, and CHS #1 is cooperating for consideration on a pending state criminal narcotics matter.

4

5:00 p.m., Deputy Sheriff Horswill watched MILLER exit the residence, and enter the gray Chevrolet Malibu and sit in the driver's seat of the vehicle.

c.   At approximately 5:15 p.m., Deputy Sheriff Horswill along with other law enforcement officers with VCSO approached MILLER, who was still sitting in the parked vehicle. Deputy Sheriff Horswill observed that MILLER appeared to be falling asleep, and that his pupils were pin point and his skin was pale, cool and sweaty, and he believed that MILLER was under the influence of a controlled substance.

d.   One of the law enforcement officers, Deputy Sergeant Malagon, identified himself as law enforcement, and asked MILLER if he had any guns in the vehicle.  MILLER responded slowly by saying that there was a gun in the back seat of the vehicle.  Another of the law enforcement officers, Detective Holt, who was standing near the passenger side of the vehicle, was able to observe, in plain view, syringes on the front passenger seat.  The law enforcement officers directed MILLER to exit the vehicle, and placed MILLER under arrest for a violation of California Health and Safety Code 15550(a)(1): Under the Influence of a Controlled Substance.

e.   During the search of MILLER's vehicle, law enforcement officers located among other items, more than two kilograms of suspected methamphetamine, nearly 200 grams of suspected fentanyl, more than 200 grams of suspected heroin, a loaded Glock 9mm handgun without a serial number, $1,565 dollars in U.S. Currency, and a working digital scale.

6. On October 5, 2020, I and other FBI agents transferred the suspected drugs that law enforcement officers with VCSO had seized from MILLER to the Southwest Regional Laboratory of the Drug Enforcement Administration in order for the drugs to be analyzed. I have reviewed the laboratory analysis reports, and have determined that MILLER possessed approximately 2,128.4 grams of actual methamphetamine, approximately 200.21 grams of a mixture or substance containing a detectable amount of heroin, and approximately 190.7 grams of fentanyl. Based on my training and experience, I am aware that these quantities of controlled substances are not quantities that can be personally used by any one individual, and I believe MILLER possessed the methamphetamine, heroin, and fentanyl with the intent to distribute them to customers in and around the San Fernando Valley.

**B.    MILLER Used the SUBJECT ACCOUNT to Distribute a Pound of Methamphetamine**

7. On November 25, 2020, a confidential human source ("CHS #2")[4] told a law enforcement officer associated with this investigation that MILLER possessed drugs to distribute to narcotics customers, and that MILLER had offered to sell drugs to CHS #2. At law enforcement's direction, CHS #2 told MILLER

---

[4] Based on my knowledge of the investigation, I am aware that CHS #2 has cooperated with the FBI since approximately ____ March of 2020. CHS #2 has a criminal history that includes state convictions for convicted felon in possession of a stun gun, assault, assault with a deadly weapon, vehicle theft, burglary, and possession of a controlled substance. Additionally, in the third quarter of 2020, CHS #2 was arrested by local law enforcement for trespassing. CHS #2 is cooperating in exchange for payment, and has received approximately $500 during the course of this investigation.

that s/he would purchase of one pound of methamphetamine from MILLER for $1,900. Based on my review of communications between MILLER and CHS #2, including communications that MILLER sent using the SUBJECT ACCOUNT, as well as my participation in a December 2, 2020 controlled purchase of methamphetamine from MILLER, I am aware of the following:

a. On December 1, 2020, CHS #2 sent MILLER a text message to telephone number (747) 253-2538, stating: "can I grab that p from you tomorrow? And it's 19 right." Based on my training, experience, and knowledge of the investigation, I believe that "p" refers to one pound of methamphetamine, and "19" to refers to the cost of $1,900 for that quantity of methamphetamine.

b. On the same day, MILLER replied to CHS #2 by sending a text message that stated: "That's what it costs me, we were gonna split the profit from whatever you can dump it for." Based on my training, experience, I believe that MILLER informed CHS #2 that CHS #2 and MILLER would divide any profit from the CHS #2's sale of the methamphetamine to customers.

c. On December 2, 2020, CHS #2 attempted to place a recorded telephone call to MILLER on telephone number (747) 253-2538, but received a message that MILLER's number was unavailable.

d. On December 2, 2020, CHS #2 placed two voice calls to MILLER via Facebook Messenger to the SUBJECT ACCOUNT in order to further discuss the upcoming methamphetamine transaction. An individual answered the calls, and said "hello,

7

hello," but then the calls dropped. CHS #2 recognized MILLER's voice during these calls.

      e. On the same day, CHS #2 communicated with MILLER via Facebook Messenger. CHS #2 sent MILLER the following Facebook message: "Can I come by and grab that. Hello. I'm coming by cool." MILLER, via Facebook Messenger using SUBJECT ACCOUNT, replied "Yes." Based on my training, experience, and knowledge of the investigation, I believe that MILLER used the SUBJECT ACCOUNT in order to confirm his upcoming methamphetamine transaction with CHS #2.

      f. On December 2, 2020, law enforcement officers fitted CHS #2 with audio and video recording and audio transmitting devices, and provided CHS #2 with $1,900 to conduct a controlled purchase of narcotics.

      g. At approximately 3:24 p.m., CHS #2 departed for MILLER's residence located in Winnetka, California. Law enforcement officers surveilled CHS #2 as s/he traveled to MILLER's residence, and pre-positioned themselves at MILLER's residence in order to observe CHS #2 arrive to and depart from the location.

      h. Law enforcement officers observed CHS #2 enter the garage of MILLER's residence, and heard CHS #2 complete the drug transaction with MILLER. The surveillance team observed CHS #2 depart from MILLER's residence, and s/he was escorted by law enforcement to the designated debriefing location where s/he provided law enforcement officers with the pound of suspected methamphetamine that MILLER had sold for $1900.

**C. Training and Experience with Respect to Individuals who Distribute Drugs**

8.    Based on my training and experience and communications with other law enforcement officers, I am aware of the following:

a.    Based on the quantity and street value of the drugs that have been seized from MILLER as well as MILLER's own statements, I believe that MILLER is involved in distributing drugs to other customers.

b.    The majority of individuals involved in the sale, transportation, and even purchase of drugs do so using cellular telephones and social media accounts such as the SUBJECT ACCOUNT.

c.    During this process, I am aware that narcotics distributors attempt to use secure communication methods to "contact and deliver" narcotics, where the buyer calls or sends a message with their social media account to the dealer and orders an amount of drugs.  They will then come to an agreement on a price and location to meet.  The dealer will then go out himself herself and meet with the buyer or send a "runner," which is a delivery person working for the dealer, to meet with the buyer and conduct the drug transaction.  I am also aware that individuals who distribute drugs use the video or camera on the cellular phones to record or take photographs of drugs they have in their possession, drug proceeds, or other items that can be used in the sale or manufacturing of drugs and will upload these items to their social media accounts.  I am aware that the

9

use of social media messaging systems such as the Facebook
Direct Messenger Application has become a crucial part of the
drug dealers' day to day operations.

### III. BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDER

9.     In my training and experience, I have learned that
providers of e-mail and/or social media services offer a variety
of online services to the public.  Providers, like the PROVIDER,
allow subscribers to obtain accounts like the SUBJECT ACCOUNT.
Subscribers obtain an account by registering with the provider.
During the registration process, providers generally ask their
subscribers to provide certain personal identifying information
when registering for an e-mail or social media account.  Such
information can include the subscriber's full name, physical
address, telephone numbers and other identifiers, alternative e-
mail addresses, and, for paying subscribers, means and source of
payment (including any credit or bank account number).  Some
providers also maintain a record of changes that are made to the
information provided in subscriber records, such as to any other
e-mail addresses or phone numbers supplied in subscriber
records.  In my training and experience, such information may
constitute evidence of the crimes under investigation because
the information can be used to identify the user(s) of an
account.

10.     Therefore, the computers of the PROVIDER are likely to
contain stored electronic communications and information
concerning subscribers and their use of the PROVIDER's services,

10

such as account access information, e-mail or message

transaction information, and account application information.

In my training and experience, such information may constitute

evidence of the crimes under investigation because the

information can be used to identify the user(s) of a SUBJECT

ACCOUNT.

11.  A subscriber of the PROVIDER can also store with the

PROVIDER files in addition to e-mails or other messages, such as

address books, contact or buddy lists, calendar data, pictures

or videos (other than ones attached to e-mails), notes, and

other files, on servers maintained and/or owned by the PROVIDER.

In my training and experience, evidence of who was using an

account may be found in such information.

12.  In my training and experience, e-mail and social media

providers typically retain certain transactional information

about the creation and use of each account on their systems.

This information can include the date on which the account was

created, the length of service, records of login (_i.e._, session)

times and durations, the types of service utilized, the status

of the account (including whether the account is inactive or

closed), the methods used to connect to the account (such as

logging into the account via the provider's website), and other

log files that reflect usage of the account.  In addition, e-

mail and social media providers often have records of the

Internet Protocol ("IP") address used to register the account

and the IP addresses associated with particular logins to the

account.  Because every device that connects to the Internet

11

must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

13.   In my training and experience, e-mail and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers of e-mails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

14.   I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account.  Only by piecing together information contained in the

12

contents of an account may an investigator establish who the actual user of an account was. Often those pieces will come from a time period before the account was used in the criminal activity. Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account. Therefore, the contents of a given account, including the e-mail addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account. For the purpose of searching for content demonstrating the actual user(s) of a SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDER to turn over all information associated with a SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

15. Relatedly, the government must be allowed to determine whether other individuals had access to a SUBJECT ACCOUNT. If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

16. I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true

meaning) when discussing their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

17.  This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

18.  As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a.  I make that request because I believe it might be impossible for a provider to authenticate information taken from

14

a SUBJECT ACCOUNT as its business record without the original production to examine. Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case. If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

      b. I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers. For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted. As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account. Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

    19. Based on a review of information provided by Facebook regarding its services and data retention policies, information provided by other FBI Special Agents, and/or my training and experience, I am aware of the information contained in this section of the affidavit regarding Facebook.

15

20.   Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

21.   Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This subscriber information may include the user's full name, any alternate names such as a maiden name or nickname, birth date, gender, contact e-mail addresses (including deleted addresses), Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook stores both current and prior information, such as past addresses or names provided by a user. Facebook also assigns a user identification number to each account.  Facebook also allows users to "link" other accounts (i.e., accounts maintained at other providers of e-mail or social media services) to their Facebook accounts, and stores information about these linked accounts.

22.  Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly

16

with individual Facebook users by sending each user a "Friend
Request," records of which requests Facebook retains.  If the
recipient of a "Friend Request" accepts the request, then the
two users will become "Friends" for purposes of Facebook and can
exchange communications or view information about each other.
Each Facebook user's account includes a list of that user's
"Friends" and a "News Feed," which highlights information about
the user's "Friends," such as profile changes, upcoming events,
and birthdays.  Facebook also retains lists of users that have
been removed or deleted as "Friends."  A user can also indicate
that some "Friends" are family members, which Facebook stores as
"Family" data.  Facebook also retains lists of persons a user
"follows" as well as a list of those persons who "follow" the
user.  Facebook also retains data regarding any friends, apps,
or pages a user has "hidden" from their News Feed.

23.  Facebook users can select different levels of privacy
for the communications and information associated with their
Facebook accounts.  By adjusting these privacy settings, a
Facebook user can make information available only to himself or
herself, to particular Facebook users, or to anyone with access
to the Internet, including people who are not Facebook users.  A
Facebook user can also create "lists" of Facebook friends to
facilitate the application of these privacy settings.  Facebook
accounts also include other account settings that users can
adjust to control, for example, the types of notifications they
receive from Facebook.

24.  Facebook users can create profiles in the "About" section of their timeline that include information about relationships, work, education, where the user lives currently, their "hometown," and personal interests, as well as photographs and other information, including "Favorite Quotes."  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  Facebook also retains data for locations associated with updates to a user's account (called "last location").  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

25.  Facebook allows users to upload photos and videos, which may include metadata (such as EXIF data) that can indicate, for example, the user's location when s/he captured or uploaded the photo or video, and the date and time the image was captured or uploaded.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a

18

notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

26. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. Facebook stores posts to a user's own page, as well as posts by a user to other peoples' pages and posts by others to the user's page. In addition, Facebook has a feature that allows users to send and receive instant messages or "chats" through Facebook. These communications are stored in the history of communications for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call. Facebook users can also send files in various other formats as attachments to private messages. For example, a user can send another Facebook account a compressed archive file in the format .zip as an attachment to a message.

27.  If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

28.  Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook retains information on posts, photos, or content a user has "liked," as well as "likes" about a user's own posts, photos, or other content; Facebook also retains data regarding "likes" a user has made on sites off of Facebook.  Facebook users can also become "fans" of particular Facebook pages.

29.  Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

30.  Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

31. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

20

32.   The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.  Lists of who has "poked" a user and who has been "poked" by a user are retained by Facebook, except for "poke" content from the mobile app, which is available for only a brief period of time.

33.   Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

34.   In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.  Facebook also retains lists of all of the apps a user has added.

35.   Some Facebook pages are affiliated with groups of users, rather than one individual user.  Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter.  Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group.  Facebook uses the

21

term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

36.  Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

37.  Facebook also stores information relating to each active session by a user, including date, time, device, Internet Protocol ("IP") address, machine cookie, and browser information.  These session logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the machine ID, user ID, and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address, browser, and device ID the user did so.

22

38.   Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including activation date and deactivation, disabling, or deletion dates, if applicable), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications

39.   As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private

23

messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.

40. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the IP addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, as described above, Facebook builds geo-location into some of its services. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.

41. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

42.  Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## IV. **REQUEST FOR NON-DISCLOSURE**

43.  Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the requested warrant is signed by the magistrate judge, or such later date as may be set by the Court upon application for an extension by the United States.  There is reason to believe that such notification will result in: (1) flight from prosecution; (2) destruction of or tampering with evidence; (3) intimidation of potential witnesses; and (4) otherwise seriously jeopardizing the investigation.

## V.  **CONCLUSION**

44.  Based on the foregoing, I request that the Court issue the requested warrant.  The government will execute this warrant by serving the warrant on the PROVIDER.  Because the warrant will be served on the PROVIDER, which will then compile the

//

//

//

requested records at a time convenient to it, reasonable cause
exists to permit the execution of the requested warrant at any
time in the day or night.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  14  day of
January, 2021.

_____ PVC
UNITED STATES MAGISTRATE JUDGE

26